**MISSOURI LAND DEVELOPMENT SPECIALTIES, LLC, a Limited Liability Company, Respondent/Cross–Appellant,**

v.

**CONCORD EXCAVATING COMPANY, L.L.C., et al., Defendants,**

**Thomas Cummings, Trustee, and First Service Bank, Appellants/Cross–Respondents.**

Nos. ED 89112, ED 89116.

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 7, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 13, 2008.

Application for Transfer Denied
Dec. 16, 2008.

John N. Borbonus, St. Louis, MO, for appellants.

Garry K. Seltzer, Diane M. Gray, Clayton, MO, for respondent.

LAWRENCE E. MOONEY, Presiding Judge.

In this mechanic's lien action, the parties appeal from the trial court's judgment entered in favor of the lien claimant. The trial court awarded the claimant a mechanic's lien, but awarded a lien amount that was less than requested. The excluded amount, found nonlienable by the trial court, represents charges for grading and excavating equipment while such equipment sat idle due to a shut-down caused by nonpayment by the general contractor. In addition to the mechanic's lien, the trial court also awarded the claimant interest on the lien amount. The bank, which holds an interest in the land that is inferior to claimant's, appeals. The lien claimant cross-appeals. The parties present a number of issues for our determination, including a matter of first impression. To guide the reader, we set out the parties' challenges in some detail, here at the outset.

The appellant bank alleges error in both the trial court's award of a mechanic's lien

and its award of interest. As to the trial court's award of a mechanic's lien, the bank raises two general, multi-faceted, challenges. First, the bank contends the trial court erred in not vitiating the claimant's lien in its entirety. It maintains that the lien claim is not a "just and true account," as required by Missouri's mechanic's lien statute, because the claimant could not provide a consistent, total principal amount of the lien and because the claimant included nonlienable items in its claim. Second, the bank alternatively argues that if the claim is not entirely disallowed, then the principal amount of the lien should be reduced. It argues for both a lower starting-point for the calculations of the principal lien amount as well as an increased value of the excluded "downtime" charges. As to the trial court's award of interest, the bank first contends that trial court erred in awarding any prejudgment interest because the lien claim was unliquidated. Secondly, the bank alternatively argues that even if an award of interest is proper, the trial court nevertheless chose an incorrect date from which to calculate the interest due.

The lien claimant cross-appeals, challenging the trial court's exclusion of the "downtime" charges as part of the awarded lien. The claimant argues that the charges are lienable through retroactive application of the amended mechanic's lien statute. The claimant also contends that the charges are lienable as "labor," and urges us to hold, as an issue of first impression, that charges for equipment during periods of nonuse are lienable under Missouri law as labor costs.

We reject each and every contention raised by the parties and affirm the trial court's judgment.

### Factual and Procedural Background

Missouri Land Development Specialties, LLC, the lien claimant in this case, is an excavating and blasting company. The company was retained in August of 2004, on a time-and-material basis, to render grading, excavating and other land-related construction services on a certain tract of land being developed as the Woods Mill Subdivision in St. Charles County. The tract of land was owned at that time by Woods Mill Development Company, LLC, which retained Concord Excavating Company, LLC, as the general contractor on the project. Concord Excavating, in turn, with the knowledge and consent of the landowner, retained the lien claimant as a subcontractor on the project. The lien claimant worked on the Woods Mill Subdivision project from mid-August 2004 until October 22, 2004. It then shut down work on the project due to nonpayment by the general contractor, but kept its equipment onsite for a period of time. No operators were present on the jobsite during this shutdown time. The lien claimant eventually moved the equipment off the jobsite, doing no further work on the property after the shutdown.

The lien claimant filed its mechanic's lien claim on January 5, 2005, approximately one month after serving the landowner with a ten-day notice of intent to lien. On the face of the lien claim, the claimant stated that it was filing the attached account "for work and labor done and material furnished" by the claimant under contract with the general contractor, "upon, to and for the buildings and improvements" at the Woods Mill Subdivision. The lien claimant attached the contract and a number of unpaid invoices with supporting documentation to its lien claim. The claimant listed the principal amount due as $628,595.43.

Over one month later, on February 14, 2005, the lien claimant filed its petition to enforce its mechanic's lien claim. The

claimant named the landowner and the general contractor as defendants. The claimant also named FirstService Bank, cestui que trust, and Thomas Cummings, trustee, as defendants having an interest in the real estate at issue. FirstService Bank was the lender for the project. FirstService Bank, cestui qui trust, and Thomas Cummings, trustee (hereinafter collectively referred to as FirstService Bank or bank) held a Construction Deed of Trust and a Modification of Deed of Trust on the parcel of land at issue. The claimant's petition included three counts related to the Woods Mill subdivision project: (1) a breach-of-contract action against the general contractor; (2) a mechanic's lien action; and (3) a quantum-meruit action against the landowner. As to the mechanic's lien action, the claimant alleged that the amount due for the labor and materials it furnished under contract with the general contractor for the project, after allowing all just credits and setoffs, was $628,595.43.

After a period of discovery, the parties proceeded to a bench trial. The lien claimant presented the live testimony of Clayton Francois, its president. The claimant also introduced the lien claim with all the attached invoices and supporting documentation. FirstService Bank presented neither live witnesses nor deposition testimony in its defense and introduced only one document into evidence—a one-page, undated and untitled document resembling a statement, which the lien claimant had produced in response to the bank's discovery request. The document lists a number of invoices, dated September through November of 2004, for blasting and excavating services. The document reflects partial payment of the invoices and then shows the grand total of the invoices to be $615,021.92.

Mr. Francois, for the lien claimant, began his testimony by explaining the type of work his company was hired to provide at the Woods Mill subdivision project under its contract with the general contractor. He then went through each of the invoices attached to the claimant's lien claim, explaining the charges, and confirming the unpaid amount due on each invoice. Of particular importance is an invoice dated November 20, 2004, on which the following notation appears at the top of the second page:

Losses due to shut down of job. Expenses remaining on standby per Eric due to payment not yet received.

The bottom of the second page of this invoice shows a subtotal due of $62,288.65. Mr. Francois stated that of all the listed invoice items, only the first four line-items on the second page were from the shutdown. These charges are ascribed to one dozer, two thirty-ton trucks, one excavator, and one 953 high lift. Mr. Francois testified that although this machinery was sitting idle on the jobsite, with no operators, the claimant was still paying rent on the machinery. Mr. Francois further testified that Eric Johnson, on behalf of the general contractor, had told him that the general contractor would pay the claimant's expenses, including the rent on the machines, while the claimant awaited payment. Mr. Francois also acknowledged that this equipment was later moved off the jobsite, doing no further work on the property after the shutdown. The charges for these particular pieces of equipment total $50,538.65.

As to the total amount of the lien claimant's claim, Mr. Francois initially testified that the claimant was requesting a mechanic's lien on the Woods Mill subdivision in the principal amount of $627,987.92, the same amount reflected on a trial exhibit prepared by counsel for the lien claimant. Later during trial, the parties recalculated the various invoices included in the lien

claim, and agreed that the sum of the unpaid invoices was $624,987.92.

The trial court entered judgment in favor of the lien claimant. The trial court first entered a money judgment against the general contractor for $953,106.58, representing the balance due on the lien claimant's unpaid invoices, plus interest and attorney's fees. Secondly, the trial court awarded the lien claimant a mechanic's lien on the real estate at issue. The trial court found that the charges listed on the unpaid invoices attached to the claimant's lien claim were all reasonable, except for $50,538.65 which the court found was not lienable. Consequently, the trial court awarded a mechanic's lien, in accordance with the unpaid invoices, in the lesser principal sum of $574,449.27, not $624,987.92 as requested. The excluded amount of $50,538.65 equals the total of charges for the above-described pieces of equipment during "downtime"—the period during which the equipment sat idle and shut down because of nonpayment by the general contractor. Lastly, the trial court awarded the lien claimant interest at 9% per annum on the lien amount of $574,449.27, calculated from October 22, 2004 through November 15, 2006, the date of judgment.

FirstService Bank, which holds an interest inferior to the lien claimant, appeals the decision of the trial court; and the lien claimant cross-appeals.[1] As noted above, the parties advance multi-faceted challenges to the trial court's award of a mechanic's lien.

### *Discussion*

### *Standard of Review*

■ As this is a court-tried case, our review is under the principles articulated in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). *Gauzy Excavating and Grading Company v. Kersten Homes, Inc.,* 934 S.W.2d 303, 304 (Mo. banc 1996). This Court will affirm the judgment unless the judgment is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy,* 536 S.W.2d at 32. In reviewing the sufficiency of the evidence to support the judgment, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Searcy v. Seedorff,* 8 S.W.3d 113, 116 (Mo. banc 1999); *In re Estate of Ferguson,* 130 S.W.3d 656, 660 (Mo.App. E.D.2004). Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Apted–Hulling Inc. v. L & S Properties, Ltd.,* 234 S.W.3d 486, 489 (Mo.App. E.D.2007). We give due regard to the trial court's superior position to assess the credibility of the witnesses. Rule 84.13(d)(2); *Ferguson,* 130 S.W.3d at 660. Lastly, we generally defer to the trial court's findings of fact; we review conclusions of law, however, without deference to the trial court. *Smith ex rel. Stephan v. AF & L Ins. Co.,* 147 S.W.3d 767, 773 (Mo.App. E.D.2004). Instead, we independently evaluate whether the trial court properly declared or applied the law. *Id.*

### *Mechanic's Lien*

### *Just and True Account*

We first address FirstService Bank's initial contention that the trial court erred in

---

1. The lien claimant and FirstService Bank entered into a pre-trial stipulation agreeing that if the lien claimant was awarded a mechanic's lien, then that lien would have priority over FirstService Bank's interest as to the land and its improvements.

not vitiating the claimant's mechanic's lien in its entirety. The bank contends the lien claim should be entirely disallowed because it was not a "just and true account" as required by Missouri's mechanic's lien statute in that: (1) the claimant could not provide a true, consistent, total principal amount of the lien; and (2) the claimant included nonlienable items in its claim.

■ Chapter 429 of Missouri's Revised Statutes addresses Missouri's mechanic's lien law. Section 429.080 requires, in part, that to obtain a valid lien, a claimant must file a "just and true account" of the demand due the claimant.[2] *Dave Kolb Grading, Inc. v. Lieberman Corp.*, 837 S.W.2d 924, 933 (Mo.App. E.D. 1992). A lien claimant's compliance with this statutory requirement is a condition precedent to the right to maintain an action and enforce a lien on property. *Holekamp Lumber Co. v. Skay*, 65 S.W.2d 669, 671 (Mo.App.1933). Filing a "just and true account" is the very "foundation of the right to maintain the suit." *Gill v. Harris*, 224 Mo.App. 717, 24 S.W.2d 673, 677 (1930). The filing of "an unjust and untrue account, knowingly made, forms no basis for a lien, and no foundation for a cause of action to enforce it, but vitiates the entire right of lien." *Id.; see also, Bremer v. Mohr*, 478 S.W.2d 14, 18 (Mo. App.1972). The statute requires the filing of a "just and true account" so that "the landowner and others interested may discern from the lien statement information sufficient to permit an investigation to determine whether the materials the claimant asserts he has furnished were actually used in the construction of the building, whether they were lienable items, and whether the amount charged is proper." *Commercial Openings, Inc. v. Mathews*, 819 S.W.2d 347, 349 (Mo. banc 1991).

■ A "just and true account," as that term is used in Section 429.080, is not defined by statute. Nor is there a precise definition of this statutory requirement in prior appellate decisions that have considered the question. Rather, whether a lien statement is a "just and true account" depends on the particular facts of each case. *Sears, Roebuck & Co. v. Seven Palms Motor Inn, Inc.*, 530 S.W.2d 695, 698 (Mo. banc 1975).

*Stated Amount of Lien*

■ FirstService Bank first contends that the claimant did not provide a "just and true account" of its lien claim because the claimant was unable to provide a consistent principal amount for which it sought a lien. The bank complains that when the claimant filed its lien claim, the face of the claim showed a balance due of $628,595.43, but that the claimant then provided a discovery response showing the amount due and owing for the lien as $615,021.92. Continuing, the bank then notes that, without supplementing its discovery response, the claimant produced a

---

**2.** Section 429.080, in its entirety, reads as follows:

> It shall be the duty of every original contractor, every journeyman and day laborer, and every other person seeking to obtain the benefit of the provisions of sections 429.010 to 429.340, within six months after the indebtedness shall have accrued, or, with respect to rental equipment or machinery, within sixty days after the date the last of the rental equipment or machinery was last removed from the property, to file

> with the clerk of the circuit court of the proper county a just and true account of the demand due him or them after all just credits have been given, which is to be a lien upon such building or other improvements, and a true description of the property, or so near as to identify the same, upon which the lien is intended to apply, with the name of the owner or contractor, or both, if known to the person filing the lien, which shall, in all cases, be verified by the oath of himself to some credible person for him.

trial exhibit, and corresponding testimony at trial, indicating a principal lien amount of $627,987.92, but then reduced that amount to $624,987.92 upon cross-examination. The bank insists that the claimant's inability to provide a consistent lien amount left the bank and the trial court with "little idea" as to the "true amount" of the claimant's lien. The bank contends that the claimant's lien claim should be entirely disallowed due to these changing lien amounts. We reject the bank's argument.

■ The claimant submitted a total of eighteen invoices, with supporting documentation, when it filed its lien claim. The exact principal sum of those invoices is $624,987.92. Moreover, to the extent FirstService Bank complains about the claimant providing a lien amount of $615,021.92, the bank is complaining about a discovery response, not the lien claim filed by the claimant. And any complaint by the bank about the claimant's failure to amend its discovery response is not preserved for appeal because no such complaint was lodged in the trial court until after trial. Furthermore, Mr. Francois, on behalf of the claimant, testified that the discovery response was missing a notation as to just one invoice, which was for various hours of machine work. This invoice had been included in the lien claim filed by the claimant, and showed a total amount due of $9,966. Adding this amount due to the $615.021.92 shown due on the discovery response renders a grand total due of $624,987.92, the exact amount of all the unpaid invoices attached to the lien claim. As to the claimant's trial exhibit, counsel acknowledged that he had made mathematical errors in preparing the exhibit, which summarized the various invoices included in the lien claim. Counsel stated he prepared the exhibit merely as an aid and courtesy for the court, to help it keep

track of the various invoices while listening to the trial testimony. Again, during trial, the parties recalculated the various invoices included in the lien claim, and agreed that the sum of the unpaid invoices was $624,987.92.

■ Arithmetic errors, errors of computation, inadvertence, or mistake in the preparation of the account, where there is no showing of the lienor's bad faith, should not defeat the lien. *Banner Lumber Co. v. Robson,* 182 Mo.App. 611, 168 S.W. 244, 246 (1914). It is not the object of the mechanic's lien law to create a rule of "literal exactitude" in the filing of lien accounts. *Id.* (quoting *Hydraulic Press Brick Co. v. McTaggart,* 76 Mo.App. 347 (Mo.App.1898)). " 'The true purpose of the statute is to exact a substantial compliance with its requirements, and this is had whenever it appears that the account filed has not been knowingly, intentionally or fraudulently falsified.' " *Id.* Here, the lien claimant did not exhibit bad faith, but merely inadvertence and errors of computation. We hold that the lien claimant substantially complied with the statutory requirement of filing a just and true account. The lien claim, with the attached invoices and documentation, appears sufficiently detailed and adequate for interested parties to undertake an investigation to determine whether the materials the claimant asserted it had furnished were actually used, whether they were lienable items, and whether the amounts charged were proper. The bank advanced no argument that they were unable to undertake such an investigation.

*Inclusion of Nonlienable Items*

■ FirstService Bank also contends that the claimant's lien claim was not a "just and true account" because the claimant included nonlienable items in its lien claim. In particular, the bank complains

about the claimant's inclusion of a $62,288.65 charge for the time that the claimant's equipment sat idle on the property, with no operators, and without doing any grading or excavating. The bank argues that this "downtime" charge is non-lienable because the claimant was neither performing "work or labor upon" the property, nor providing any "benefit or improvement" to the property, as required by Missouri law. The bank contends that the claimant's lien claim should be entirely disallowed due to the inclusion of this non-lienable charge. We reject the bank's flawed and insufficient argument.

■■■■ The parties ardently dispute whether the complained-of "downtime" charges are lienable. We are called upon to decide the issue, but need not reach it here to resolve the bank's assertion because even if we presume that the charges are nonlienable, it has long been recognized that including nonlienable items in a lien statement does not necessarily vitiate the entire lien. A lien statement may be regarded as " 'just and true,' so as not to vitiate the entire lien, if the inclusion of a nonlienable item is the result of honest mistake or inadvertence without intent to defraud and if the nonlienable [item] can be separated from the lienable items." *Seven Palms Motor Inn,* 530 S.W.2d at 698–9; *see also, Dave Kolb Grading,* 837 S.W.2d at 933 (stating that "[a] lien statement may be regarded as just and true if it contains mistakes or errors of omission, as long as those inaccuracies are unintentional and are the result of honest inadvertence, accident, or oversight, and do not result from deliberate intention or design"); *see also, American Property Maintenance v. Monia,* 59 S.W.3d 640, 643–4 (Mo.App. E.D.2001). Conversely, a lien statement may not be regarded as "just and true" and " 'can form no basis for the adjudication and establishment of a

lien for any part of the account' where the lien claimant deliberately, with intent to defraud, includes in the account a nonlienable item knowing it to be nonlienable." *Seven Palms Motor Inn,* 530 S.W.2d at 699 (quoting *Reese v. Hoyer,* 95 S.W.2d 884, 886 (Mo.App.1936)). The bank, however, neither argues that the complained-of "downtime" charges are inseparable from the other lienable charges, nor that the lien claimant deliberately included the "downtime" charges with the intent to defraud, knowing them to be nonlienable. Thus, the bank has failed to advance or develop any argument sufficient to vitiate the entire lien claim.

*"Downtime" Charges*

While it was unnecessary for us to address the issue of the lienability of the "downtime" charges in order to dispose of the bank's claim, we must confront the question to decide the lien claimant's cross-appeal. Essentially, the lien claimant advances two arguments as to why the "downtime" charges are lienable in this case. First, the claimant contends that the charges are lienable through retroactive application of the amended statutory language of Section 429.010. Second, the claimant contends that the charges are lienable as "labor." We address each contention in turn.

*Retroactive Application of Statute*

Mechanic's liens were unknown at common law and exist purely as a creature of statute. *Bush Construction Machinery, Inc. v. Kansas City Factory Outlets, L.L.C.,* 81 S.W.3d 121, 123 (Mo.App. W.D. 2002). Therefore, the question of whether the "downtime" charges are lienable is governed purely by Section 429.010 and legislative intent, as ascertained by the courts. *Id.* However, no Missouri case has dealt squarely with the question of whether "downtime" charges are lienable.

Section 429.010 delineates the circumstances that create a lien. When the lien at issue accrued in 2004, the statute provided, in relevant part, as follows:

> Any person who shall do or perform any work or labor upon, or furnish any material, ... for any building, erection or improvements upon land, or for repairing the same, ... under or by virtue of any contract with the owner ... thereof, or his ... contractor ... upon complying with the provisions of sections 429.010 to 429.340, shall have for his work or labor done, or materials, ... furnished, ... a lien upon such building, erection or improvements, and upon the land belonging to such owner ... on which the same are situated, ... to secure the payment of such work or labor done, or materials ... furnished ....

Section 429.010 RSMo (2000). The General Assembly, however, amended this section in 2005, to read in relevant part, as follows:

> Any person who shall do or perform any work or labor upon, *rent any machinery or equipment,* or furnish any material, ... for any building, erection or improvements upon land, or for repairing, *grading, excavating, or filling of* the same, ... under or by virtue of any contract with the owner ... thereof, or his ... contractor ... upon complying with the provisions of sections 429.010 to 429.340, shall have for his ... work or labor done, *machinery or equipment rented* or materials ... furnished, ... a lien upon such building, erection or improvements, and upon the land belonging to such owner ... on which the same are situated, ... to secure the payment of such work or labor done, *machinery or equipment rented,* or materials ... furnished .... *For claims involving the rental of machinery or equipment, the lien shall be for the reasonable rental value of the machinery or equipment during the period of actual use and any periods of nonuse taken into account in the rental contract, while the equipment is on the property in question. There shall be no lien involving the rental of machinery or equipment unless:*
> *(1) The improvements are made on commercial property;*
> *(2) The amount of the claim exceeds five thousand dollars; and*
> *(3) The party claiming the lien provides written notice within five business days of the commencement of the use of the rental property to the property owner that rental machinery or equipment is being used upon their property. Such notice shall identify the name of the entity that rented the machinery or equipment, the machinery or equipment being rented, and the rental rate.*

Section 429.010 RSMo (2005 Supp.).[3] We have emphasized the amendments to the statute; in all other respects, the language of the amended statute is the same as the prior version of the statute.

The legislature's amendment to Section 429.010 followed at some distance the appellate court's decision in *Bush Construction Machinery, Inc. v. Kansas City Factory Outlets, L.L.C.,* 81 S.W.3d 121 (Mo. App. W.D.2002). In that case, the court held that a supplier of rental equipment could not obtain a mechanic's lien for the nonpayment of equipment rental fees. In so holding, the court called upon the legislature to consider whether a lien for lessors of machinery is desirable. *Bush,* 81

**3.** The General Assembly again amended this statutory section, in 2007, providing that the three requirements for a lien involving the rental of machinery equipment, enumerated at the close of the statutory section, shall not apply to persons who use rented machinery or equipment in performing the work or labor described earlier in the section.

S.W.3d at 126. The legislature's amendment to Section 429.010 came three years later.

■ The lien claimant here urges for retroactive application of the amended statute to the instant case, and argues that the amended statute supports its contention that the contested "downtime" charges in this case are lienable. The claimant argues that the statute means that charges for a period of nonuse of equipment are lienable by the equipment lessor. The claimant acknowledges that this case does not involve an equipment lessor, but nevertheless argues, in conclusory fashion, that the amendment should be applied here, where there is a contract for labor and equipment and not just the provision of the rented machinery. We are unpersuaded.

We need not embark on a protracted analysis of whether the amended statute may be applied retroactively. For, even if we were to conclude that the amended statute could be so applied, this would provide no assistance to the claimant in its quest to have the "downtime" charges included in the awarded lien. We initially note that, as written, the language at the beginning of the amended statute—"[a]ny person who shall ... rent ..."—could be viewed as applying to both lessors and lessees of machinery and equipment. Such is the nature of the word "rent." Given, however, that the legislature amended the statute following this court's call in *Bush* for the legislature to consider whether a lien for lessors of machinery is desirable, it is arguable that the amended language was meant to provide liens only for the lessors of equipment. And in this case the lien claimant is not a lessor, but rather a lessee. However, even if we did read the amended statutory language as encompassing lessees, the lien claimant still cannot escape the language in the latter part of the amended statute. This language provides that the lien shall be "for the reasonable rental value of the machinery ... during the period of actual use and any periods of nonuse taken into account in the **rental contract.**" (Emphasis added). The statute plainly and clearly refers to the *rental* contract—or in other words, the contract between the lessor and lessee, not the contract at issue between the lien claimant, as a subcontractor, and the general contractor. Indeed, the rental contract here is not even a part of the record. In sum, the amendments to Section 429.010, even should they apply retroactively, still would not allow the charges at issue to be lienable in this case. This does not conclude our consideration of the issue, however, for we must proceed to determine if the statute otherwise provides that the "downtime" charges are lienable as "labor."

*"Downtime" Charges as "Labor"*

■ The lien claimant alleges that the costs for "downtime" or nonuse of machinery and equipment, when provided for in a contract, are lienable as "labor" that is used, entered or consumed in the improvement of real estate subject to a mechanic's lien. We reject the claimant's contention because the "downtime" charges here do not come within the plain and ordinary meaning of the term "labor," and because we find the facts of this case distinguishable from those cases that find equipment or "downtime" charges lienable as labor costs.

■ Broadly stated, Section 429.010 provides that any person who performs "labor upon ... any building, erection or improvements upon land ..." shall have a lien for his labor done. When interpreting a statute, we are to "ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordi-

nary meaning." *State ex rel. Evans v. Brown Builders Elec. Co., Inc.*, 254 S.W.3d 31, 35 (Mo. banc 2008). In so doing, we look to statutory definitions or, if none are provided, the text's plain and ordinary meaning. *Gash v. Lafayette County*, 245 S.W.3d 229, 232 (Mo. banc 2008). The term "labor" is not defined under Chapter 429. In the absence of statutory definitions, the plain and ordinary meaning of a term may be derived from a dictionary. *State ex rel. Burns v. Whittington*, 219 S.W.3d 224, 225 (Mo. banc 2007). "Labor" is defined as "work of any type, including mental exertion . . . ." or "work; toil; service; mental or physical exertion . . . ." Black's Law Dictionary 878 (7th ed.1999); Black's Law Dictionary 874 (6th ed.1990). "Labor" is also defined as the "expenditure of physical or mental effort esp. when fatiguing, difficult, or compulsory; . . . human activity that produces the goods or provides the services in demand in an economy; the services performed by workers for wages as distinguished from those rendered by entrepreneurs for profits . . . ." Webster's Third New International Dictionary 1259 (1967).

It is well-established that the mechanic's lien law of Missouri is remedial in nature. *R.L. Sweet Lumber Co. v. E.L. Lane, Inc.*, 513 S.W.2d 365, 371 (Mo. banc 1974). The law's purpose is "to give security to mechanics and materialmen for labor and materials furnished in improving the owner's property." *Id.* As a general rule, statutes relating to mechanic's liens should be construed as favorably to those persons as its terms will permit. *Id.* Even under the most liberal of interpretations, however, we cannot construe charges for equipment that was sitting idle, without operators, and then later removed from the jobsite, doing no further work after the shutdown, as "labor," as that term is plainly and ordinarily understood.

The claimant argues this is a "labor and machinery" case. Specifically, the claimant contends that the courts of this state have consistently ruled that the costs for equipment in excavation work are lienable, where the contract also called for the provision of labor. The claimant notes that, under its contract with the general contractor, it provided labor along with the excavating equipment. Thus, the claimant argues, the "downtime" costs for equipment are lienable because the value of the equipment furnished, including the value of the time of nonuse, was a part of the labor cost that ultimately produced the improvements to the property.

We recognize there is precedent for the proposition that a lien is permissible for equipment where both labor and machinery are furnished on a construction site. Liens for grading and excavating work, held proper by the court, have included the costs of equipment. *See Vasquez v. Village Center, Inc.*, 362 S.W.2d 588 (Mo.1962) (lien amount included charges for various types of equipment); *see also, Marsh v. Allright Missouri, Inc.*, 568 S.W.2d 577 (Mo.App.1978)(lien amount included charges for rental of equipment—crane, clam shell, wrecking ball). The claimant's argument, however, misses the mark. First, we note that the propriety of equipment charges as part of the lien was not at issue in these cases. Including the cost of equipment in a lien, however, is somewhat logical. In certain situations the equipment is necessary or ancillary to the laborer's performance of his work. For example, one cannot readily excavate a site without equipment. But here, the claimant's claim is for equipment costs incurred during a period of downtime when no laborers were present. Moreover, the equipment was later removed from the jobsite, doing no further work after the shutdown. In this instance, we cannot say

that the costs incurred for equipment during a period of downtime were a part of the labor cost that ultimately produced the improvements to the property.

■■■ The lien claimant cites decisions from other states to support their argument that the "downtime" charges in this case should be lienable as "labor." Our Supreme Court has warned of the danger of relying upon decisions of other states in interpreting Missouri's mechanic's lien law. As the Court cogently cautioned, "[t]he points of dissimilarity [between the law of Missouri and the laws of other states] must be clearly borne in mind to avoid the error of applying, to the interpretation of our own statute, decisions of other states construing language quite different." *Henry & Coatsworth Co. v. Evans*, 97 Mo. 47, 10 S.W. 868, 869 (1889). Mindful of that caution, we can nevertheless glean some guidance from reviewing the decisions of other states' courts. And our review demonstrates that the facts of this case are readily distinguishable from these other cases that allow downtime charges as a lienable item.

The claimant principally relies on the federal court's decision in *Prepakt Concrete Co. v. Fidelity & Deposit Co. of Md.*, 393 F.2d 187 (C.A.Ill.1968), wherein the court, applying Illinois law, held that "waiting time" was part of the labor cost, and therefore lienable. The Illinois lien statute then allowed for mechanic's liens for persons who "furnish material, fixtures, apparatus or machinery . . . or furnish or perform labor or services as . . . laborer or otherwise. . . ." 770 ILCS 60/1. In *Prepakt*, the lien claimant, a sub-subcontractor, sued for labor and material charges incurred in the construction of a high-rise apartment building. Part of the claimant's lien claim was for "waiting time"—time when the claimant's personnel and equipment stood ready on the site, but unable to

work, through no fault of the claimant. Under the contract, the subcontractor agreed to pay the claimant, as follows:

$45.00 per hour after the claimant moved its men and equipment onto the site for any time during which the claimant was unable to work because of circumstances beyond its control.

*Prepakt*, 393 F.2d at 189. The defendants argued that the "waiting-time" charges should not be included in the lien because time is not "labor and materials" covered by a mechanic's lien. The court rejected this argument, noting first that the claimant's personnel and equipment were moved on the job site at the subcontractor's request. The court further reasoned that the possibility of waiting time while the claimant was at the job site, but was unable to work, was contemplated by the subcontractor and the claimant and they agreed upon an hourly rate to be paid during waiting time. *Id.* at 190. The court thus concluded that "the personnel and equipment was being furnished [to the subcontractor] while [Prepakt] stood ready on the site, and the value of that time was part of the labor cost which ultimately produced the building under construction." *Id.*

The lien claimant here also relies on the Texas court's decision in *McClellan v. Haley*, 250 S.W. 413 (Tex.Com.App.1923), wherein the court recognized "shut-down" time as labor. The *McClellan* case involved an action to recover for labor performed, and for "shut-down" time, under a contract for drilling an oil well. The Texas court ultimately held that the lien claimant was not entitled to a lien because the claimant failed to give notice as required by Texas's lien law. The court, in dicta, however, recognized "shut-down" time as labor within the terms of the state's lien statute, noting as follows: ". . . the plaintiffs had the *right to contract against lost*

*time* as well as for labor actually performed. *Having so contracted,* we can see no reason for not allowing compensation for lost time caused by the failure of the defendants to provide material and supplies for continuous labor, and that *such lost time is labor* and comes within the terms of the statute." *McClellan,* 250 S.W. at 414. (Emphases added).

We also note the decision of the Kansas Supreme Court in *Skinner v. Quadrangle Oil Co.,* 112 Kan. 742, 212 P. 684 (1923), wherein the court held that compensation for "waiting time" could be included in a lien. The *Skinner* case involved an action to enforce a mechanic's lien on an oil and gas lease, and on the casing, derrick, and other property connected with a well drilled by the claimant on the leasehold. The applicable Kansas lien law in effect at the time provided that "any person ... who shall under contract ... perform labor or furnish material, machinery and oil well supplies used in the digging, drilling, ... of any oil or gas well ... shall have a lien upon the whole of such leasehold...." *Skinner,* 212 P. at 685 (quoting Section 4996 of the General Statutes of Kansas, 1915). The claimant's lien included charges for "waiting time"—time consumed in waiting for supplies to be furnished by the owner. The contract in the *Skinner* case read, in pertinent part, as follows:

> It is further understood and agreed, by and between the parties to this contract, that in the event of a shutdown, at the request of the parties of the second part, the first parties shall receive the sum of $30.00 per day, provided, however, that the shutdown is cause by the failure of the parties of the second part to furnish

the necessary equipment such as casing, and other necessary equipment to be furnished by the parties of the second part; then and in that event said parties of the first part shall receive $80.00 per day during such shutdown or delay.

*Skinner,* 212 P. at 686.

The defendants in *Skinner* argued that because liens are given for improvements made to property, no lien could attach because nothing was added to the well during the "waiting time." The court rejected this argument, holding that compensation for "waiting time" may be included in a lien, where the contract provides that the driller shall be paid for such time. The court stated that "[t]ime must be considered as a part of the labor necessary to drill the well." *Id.* The court reasoned that "[i]n such work, delays must occur, and labor, not directly connected with the well, must be performed before the well can be completed. All becomes a necessary part of the labor in putting down the well, and the statute contemplates that a lien shall attach for all that is necessary to be done, including waiting for supplies and time lost when operations are shut down on account of the fault of the owner." *Id.*

We set forth these decisions in some detail to highlight three significant circumstances that render these out-of-state cases readily distinguishable from our circumstances. First, in these other cases the contracts directly spoke to payment for periods of inactivity. Specifically, in the *Prepakt* and *Skinner* cases, the contracts provided for an hourly or daily rate to be paid for any downtime periods.[4] Contrary to the lien claimant's assertions, the contract in our case is unlike these other contracts.[5] The contract here reads, in pertinent part, as follows:

---

4. We recognize that the terms of the parties' contract in the *McClellan* case are not provided in the court's decision. However, it is apparent from the court's language that the parties specifically contracted against lost time.

5. Specifically, the lien claimant states that its contract is the same as the contract in the

(12) If equipment is stopped for insufficient payment reasons, substantial restart or remobilization fees will apply to compensate Missouri Land Development for lost time, movement of equipment and explosives, and re-permitting

The lien claimant contends this provision shows that charges for "downtime" are provided for in the contract. But it is a far leap to conclude that "downtime" charges should be classified as "labor" from this contractual provision. This contract provides for restart fees after a shutdown; it does not otherwise provide for payment for periods of inactivity. It certainly does not speak to any hourly or daily rates to be paid for any downtime periods, as was present in the out-of-state cases. We cannot say, based on the language of this contract provision, that the parties contemplated payment for charges that accrued during periods of inactivity.

The contractual language is not the only point of distinction. We also note that in *Prepakt*, the men were on-site during the downtime; that is not the case here. And thirdly, the lien claimants in these other cases resumed work after the period of inactivity; that is also not our case. In light of these distinctions, we do not conclude that the value of downtime here was "part of the labor cost which ultimately produced the building under construction," as held by the *Prepakt* court. Nor can we say that the downtime here was merely a "delay" that "must occur" as a "necessary part of the labor" in completing the project, as held by the *Skinner* court.

■ The bank contends the accrued charges are not lienable because the lien claimant was neither performing "work or labor upon" the property, nor performing a service during the shut-down time that

provided a "benefit or improvement" to the property. After all, the bank argues, the machines were sitting idle, without any operators, and then were removed from the job site, performing no further work on the property. Considering the general principles of mechanic's lien law, this argument is sound. Broadly stated, in order for a person to have a mechanic's lien upon a particular property, the work, labor, and materials comprising the source of the lien provided to the property must have "actually entered" or "went into" or were "used in" the construction of an improvement on the property that is the subject of the lien. *Kansas City Elec. Supply Co. v. Bomar Elec. Co., Inc.*, 581 S.W.2d 411, 413 (Mo. App. W.D.1979); *see also, Tallman Co. v. Villmer*, 133 S.W.2d 1085, 1087 (Mo.App. 1939); *Davidson v. Fisher*, 258 S.W.2d 297, 301 (Mo.App.1953); *Boyer Lumber, Inc. v. Blair*, 510 S.W.2d 738, 745 (Mo.App.1974)(overruled on other grounds by *R.L. Sweet Lumber Co. v. E.L. Lane, Inc.*, 513 S.W.2d 365 (Mo.1974)). For example, materials such as lumber, paneling, and sheet rock, used in the construction of a residence are lienable. *Boyer Lumber*, 510 S.W.2d at 747. Items such as tape, paint and paint brushes, sandpaper, and saw blades may be included in a mechanic's lien if they are used up or consumed in improving the property. *Id.* On the other hand, the court has concluded that a lien was unavailable for the supplier of a hot-water heating plant that was only partially installed in a building and then removed, because it was not consumed, was never installed, did not enter into the construction of the building, and never conferred "the slightest benefit" on the property or the owners thereof. *Tallman*, 133 S.W.2d at 1088. It is difficult to imagine how idle,

*Prepakt* case. Clearly, this is not the case. We remind counsel of their duty of candor to

this Court.

unmanned equipment that was later removed from the job site, performing no further work on the property, "actually entered" or "went into" or was "used in" the development project. Indeed, we fail to see how the equipment here conferred even the slightest benefit to the land during the shut-down.

We note the Arizona Supreme Court's decision, *Kerr–McGee Oil Industries, Inc. v. McCray,* 89 Ariz. 307, 361 P.2d 734 (1961). There, the lien claimant was hired to furnish a well drilling rig, fully manned, for the purpose of drilling some wells. The claimant operated the rig for a period of time, until the owner requested the rig to be shut down. The owner further requested that the rig not be moved from the location and that it stand-by, available for further service. The claimant complied with this request, keeping his rig at the site for approximately five months, at which time another company acquired an interest in the property. The claimant then commenced drilling operations under a contract with the new company. The claimant filed a lien claim for the five-month stand-by time.

The Arizona Supreme Court held that he claimant was not entitled to a lien for this stand-by time. *Kerr–McGee,* 361 P.2d at 737. Under Arizona law, for a materialman to claim and enforce a mechanic's lien against the owner for machinery furnished, the furnished machinery must have become a part of the construction, erection, or completion of the improvement. *Id.* at 736. "The machinery must become a necessary instrumentality in accomplishing the work." *Id.* The court reasoned that the machinery was not part of the completion of the improvement while it was on "stand-by" status and thus, since the stand-by machinery did not contribute to the improvement of the property, the claimant was not entitled to a lien. *Id.* at 736–7. Similarly here, the lien claimant's equipment likewise did not contribute to the improvement of the property while sitting idle on the work-site, without operators, only to be subsequently removed from the jobsite, doing no further work after the shutdown.

We are mindful that Missouri's mechanic's lien laws are remedial in nature and should be liberally construed in favor of the one seeking the lien. However, there are limits to this policy of liberal interpretation. Such interpretation comes only after it is clear that a mechanic's lien is appropriate. *Bush,* 81 S.W.3d at 126. No statute should be construed so liberally as to give it a meaning never intended by the legislature. *Id.* (citing *Southeastern Steel Erectors, Inc. v. Inco, Inc.,* 108 N.C.App. 429, 424 S.E.2d 433, 436 (1993)); *see also, Bates County Redi–Mix, Inc. v. Windler,* 162 S.W.3d 98, 102 (Mo.App. W.D.2005)(noting that while mechanic's lien statute should be construed as favorably to mechanics and materialmen as their terms permit, the statute "cannot be extended to facts not fairly within its general scope"). Based on the facts of this case, we cannot hold that costs of equipment during periods of nonuse are "labor" costs and therefore lienable. We deny the lien claimant's cross-appeal, and affirm the trial court's exclusion of the charges from the principal amount of the awarded mechanic's lien.

*Principal Amount of Lien*

We are left, then, with the question regarding the principal amount of the lien. The bank contends that in the event the claimant's mechanic's lien is not vitiated in its entirety, then the principal amount of the lien should be reduced. The bank argues for both a lower starting-point for the calculations of the principal lien amount as well as an increased value of the excluded "downtime" charges—the effect of both would be to reduce the

amount of the mechanic's lien awarded. The bank first contends that, because the lien claimant never supplemented its discovery responses, the trial court should have limited the principal amount of the lien to the amount shown on the alleged discovery response—$615,021.92—before making deductions for nonlienable items, rather than using $624,987.92 as the starting point for the court's calculations of the lien award. Again, the bank's complaint regarding the lien claimant not amending its discovery responses is not preserved for appeal. A value of $624,987.92 is supported by the evidence, as well as the parties' agreement at trial. As to the value of the excluded "downtime" charges, the bank maintains that the trial court erred in finding the nonlienable items to be valued at only $50,538.65. The bank maintains that the evidence at trial indicated the value of the nonlienable items to be $62,288.65. The bank's argument is without merit. Mr. Francois testified that only four items had to do with the shutdown. The sum total of these "downtime" charges comes to $50,538.65.

Thus, the trial court did not err in not vitiating Missouri Land Development's mechanic's lien in its entirety for failure of the lien claimant to file a just and true account. Nor did the trial court err in excluding the $50,538.65 "downtime" charges as nonlienable. And lastly, the trial court's calculations as to the principal amount of the lien, and the amount of the excluded charges is supported by substantial evidence.

## Prejudgment Interest

We now turn to the issue of prejudgment interest, which was to accrue at 9% simple interest per annum on the lien balance due, calculated from October 22, 2004 through November 15, 2006, the date of judgment. Again, FirstService Bank first alleges that the trial court erred in awarding any prejudgment interest at all; and second, the bank alleges that even if the trial court properly awarded interest, the trial court erred in its choice of October 22nd as the date from which to calculate the interest due.

### Award of Interest

 FirstService Bank alleges that the trial court erred in awarding prejudgment under Section 408.020 because the claimant's lien claim was unliquidated in that it was not fixed and determined, readily determinable, or ascertainable by computation.[6] However, first, there is simply no indication that the trial court awarded prejudgment interest pursuant to Section 408.020. And second, the bank ignores the mechanic's lien law of this state, in particular, Section 429.210. That section provides that the trial court may render judgment "in any sum not exceeding the amount claimed in the demand filed with the lien, *together with interest* and costs . . . ." Section 429.210 (emphasis added). An award of prejudgment interest on a mechanic's lien claim is mandatory once the trial court assesses the principal amount due on such a claim. *Monia,* 59 S.W.3d at 646; *Dave Kolb Grading,* 837 S.W.2d at 933. "It would be an incomplete

---

6. Section 408.020 provides that creditors will be allowed to receive interest "for all moneys after they become due and payable, on written contracts . . . after they become due and demand of payment is made . . . ." As a general rule, in order for prejudgment interest to be awarded under this section, the claim for damages must be liquidated. *Watters v. Travel Guard, Int'l,* 136 S.W.3d 100, 111 (Mo.App. E.D.2004). A claim is liquidated when the claim is fixed and determined or readily determinable; it is sufficient if the amount due is ascertainable by computation or by a recognized standard. *Id.* FirstService Bank maintained that the lien claimant's claim was unliquidated because the claimant did not provide a consistent indication as to the "true" principal amount of the claim, and because there was a dispute over the inclusion of "non-lienable" items in the claim.

remedy to allow a lien for the reasonable cost of the work and materials but not interest thereon after the account should have been paid." *Mid–West Engineering & Const. Co. v. Campagna,* 421 S.W.2d 229, 233 (Mo.1967). Having awarded the lien claimant a mechanic's lien, the trial court properly awarded prejudgment interest on the claimant's claim.

*Date for Interest*

 FirstService Bank next alleges that the trial court erred in awarding prejudgment interest from October 22, 2004, because proper demand was not made until the claimant filed its mechanic's lien on January 5, 2005. The bank did not advance this argument to the trial court. At no time did the bank suggest, request, or argue that prejudgment interest should be calculated from January 5th. Rather, the bank argued in its post-trial memorandum that interest calculations should commence from December 20, 2004. We will not convict the trial court of error on an issue that was never presented to the trial court for its consideration. *McMahan v. Mo. Dep't of Soc. Servs.,* 980 S.W.2d 120, 126–7 (Mo.App. E.D.1998). "We cannot consider a claim of error not presented to and decided by the trial court." *Monia,* 59 S.W.3d at 645. Moreover, even if we were to consider the claim, we would find the claim meritless, as the bank's argument is again entirely premised upon the faulty assumption that the trial court awarded interest pursuant to Section 408.020. We deny the bank's two points regarding prejudgment interest.

We affirm the judgment of the trial court.

BOOKER T. SHAW and KURT S. ODENWALD, JJ., concur.