TRANSCONTINENTAL HOLDING LTD., f/k/a Transcontinental Indemnity, Ltd., Plaintiff/Appellant,

v.

FIRST BANKS, INC., Defendant/Respondent.

No. ED 91469.

Missouri Court of Appeals, Eastern District, Division Two.

Sept. 1, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 21, 2009.

Application for Transfer Denied Jan. 26, 2010.

David S. Corwin, St. Louis, MO, for appellant.

Michael W. Bartolacci, Matthew J. Landwehr, St. Charles, MO, for respondent.

LAWRENCE E. MOONEY, Judge.

Today we tell the tale, admittedly a long tale, of a bank ensnared in a dispute between two businessmen, Ron Scharf and Alexander Kogan. Scharf and Kogan, each operating through various business entities, engaged in a complex series of transactions. Over the course of these, Scharf loaned large sums of money to Kogan. In time, Scharf, who believed he was owed millions, learned that Kogan had money on deposit at First Bank. Scharf succeeded in having the bank transfer money from an account controlled by Kogan, to a new account, over which Scharf had sole control. From this new account, Scharf then persuaded the bank to issue a cashier's check payable to one of Scharf's companies. Scharf, however, was not honest with the bank. The bank, upon learning that Kogan disputed Scharf's authority

to withdraw funds from the Kogan account, stopped payment on the cashier's check. The dispute between Scharf and Kogan is not ours to decide. Rather, today we decide only the dispute between Scharf and the bank. In so doing, we must determine a matter of first impression: whether, under Missouri's Revised Uniform Commercial Code, a bank may refuse payment and assert its own defenses against liability on its cashier's check. We answer that it may.

### Factual and Procedural Background

This appeal concerns events occurring in May of 2006, when Ron Scharf entered First Bank and procured a cashier's check made payable to the appellant Transcontinental, and the bank then stopped payment on that check. In order to put these events in context, however, we must first travel back to early 2005, when Ron Scharf met Alexander Kogan and the two embarked on a business venture.

Ron Scharf owns and operates a number of businesses, collectively referred to as the "Scharf Affiliates."[1] In general, these businesses are either in manufacturing or insurance. Scharf's manufacturing businesses produce and sell many products, among which are large commercial heaters and air conditioners. Of the Scharf Affiliates in the insurance business, one is germane to this appeal: Transcontinental Holding, Ltd.,[2] the appellant in this case. Transcontinental is a paying agent; it acts as an escrow agent for its sister corporation, Transcontinental Insurance, a company that provides product-liability insurance policies for hard-to-insure businesses.

Ron Scharf met Alexander Kogan in early 2005. The two were introduced by Kogan's cousin, a Russian-immigrant engineer who worked for Scharf. Alexander Kogan, himself a Russian immigrant, was represented as having key connections in the Russian government, such that he had been able to broker the sale of some former Soviet Union debt. Kogan purportedly received a substantial commission for his efforts. He reportedly lost that money, however, and was experiencing financial difficulties at the time he was introduced to Scharf.

Kogan approached Scharf with a proposal to promote and sell air structures in Russia, using Kogan's relationships and contacts with members of the former Soviet Army. An air structure is a prefabricated, fabric building that relies on air, rather than columns, pillars, or posts, for support.[3] Heaters and air-conditioners, such as those manufactured by Scharf's companies, circulate the air that holds up the structure. Kogan did not have sufficient financial resources for the endeavor, and approached Scharf about investing in one of his companies. Scharf ultimately agreed to provide financing. As a result, Ron Scharf and Alexander Kogan, both personally and through corporate entities, entered into a series of complex business agreements, evidenced by a number of documents executed between February 1st and August 1st, 2005. Scharf relied on

---

1. Specifically, at trial the "Scharf Affiliates" referred to, and was deemed to include, each and every person or entity related to or controlled by Ron Scharf. Although the parties referred to these various entities in the aggregate at trial, the only payee of the cashier's check in question, and the only plaintiff, was the appellant Transcontinental. None of the other Scharf Affiliates, including Scharf himself, were parties to the lawsuit, nor did they assert any claims against First Bank.

2. This company was formerly known as Transcontinental Indemnity, Ltd.

3. An example of an air-supported structure is the Exploradome at the St. Louis Science Center.

these documents, and the purported powers set forth in those documents, when he procured the cashier's check at First Bank. We summarize these four general groups of agreements to set the stage for the critical events that later transpired at First Bank. As we shall see, although these agreements may demarcate the rights and liabilities of Scharf and Kogan, ultimately these agreements have little bearing on the rights and liabilities of the bank under the Uniform Commercial Code.

### Scharf—Kogan Agreement, February 1, 2005; Promissory Note; Security Agreement

The first in the series of Scharf–Kogan agreements came on February 1, 2005, when the Kogan Affiliates [4] entered into an agreement with one of the Scharf Affiliates. By its terms, the Kogan Affiliates appointed a Scharf Affiliate company as the Kogans' sole and exclusive manufacturer and supplier of heating, ventilating, and air-conditioning equipment for use with all air-supported structures sold by the Kogan Affiliates. Scharf and Kogan also established a lender-borrower relationship; specifically, the Scharf Affiliate agreed to extend $500,000 in working capital to the Kogan Affiliates, as a line of credit for the purchase of air-handling equipment from the Scharf Affiliates.

In conjunction with this February 1st agreement, the Kogan Affiliates executed a Promissory Note and Line of Credit, by which the Kogan Affiliates promised to pay the Scharf Affiliate the extended loan amount of $500,000, plus interest, no later than July 1, 2005. To secure the payment and performance of the obligations incurred by the Kogan Affiliates under the note, the Kogan Affiliates also executed a Security Agreement, by which the Kogans purportedly granted the Scharf Affiliate a security interest in a broad range of collateral set forth and detailed in the Note and contemporaneously-executed Security Agreement.

### Resolution, February 21, 2005

Just over two weeks later, on February 21, 2005, Alexander Kogan executed a document entitled "Resolution of the Members of IPD Sales & Marketing, LLC." In part, this resolution, approved and adopted by Kogan as sole member of the company, stated that Ron Scharf was authorized to open a bank account in the name of the limited liability company and to be sole signatory thereon for all purposes.

### Scharf—Kogan Agreement, May 3, 2005

The Scharf Affiliates and Kogan Affiliates entered into an additional agreement on May 3, 2005. This agreement notes that Scharf is forming and capitalizing two corporations to sell and manufacture air-supported structures. The agreement further notes that the Kogan Affiliates would exclusively market air-supported structures in the "Eastern Bloc" territory, which included Poland, the Czech Republic, and the countries of the former U.S.S.R.; Scharf's newly-formed corporations would manufacture and market air-supported structures in the rest of the world. The agreement also includes what is best described as exclusive-purchase provisions. The parties agreed to exclusively purchase any and all air-supported structures they sold, as well as the heating, ventilating, and air-conditioning equipment to be used with those structures, from Scharf's newly-formed corporation and the Scharf Affiliates.

---

4. Like the use of collective term "Scharf Affiliates" at trial, the collective term "Kogan Affiliates" referred to, and was deemed to include, each and every person or entity related to or controlled by Alexander Kogan.

*Foreclosure; Redemption Bond; Escrow Agreement with Power of Attorney; Sinking Fund Agreement, July 2005*

Kogan approached Scharf during the summer of 2005 for additional financial assistance. The Kogan Affiliates' office building, located at # 1 The Pines Court in St. Louis County, Missouri, had been the subject of foreclosure proceedings. This property was owned by IPD Properties, LLC, a limited liability company formed by Kogan, and was subject to a mortgage deed of trust in favor of Truman Bank. The bank foreclosed and the property was sold at a foreclosure sale on July 5, 2005. At Kogan's request, Scharf agreed to post a redemption bond for Kogan. Scharf testified that he agreed to provide the bond only if Kogan would turn over complete control of the property to him and allow him to control the sale of that property. He also insisted that Kogan set up a fund, to be controlled by Scharf, into which Kogan would deposit funds for the payment of Kogan's mounting bills and obligations.

As a result of the parties' discussions, the Kogan Affiliates and the Scharf Affiliates executed an Escrow Agreement (with Power of Attorney). Scharf's company, Transcontinental, is designated as escrow agent under this agreement. The parties agreed that the purpose of the Escrow Agreement was for Scharf and Transcontinental to supervise the sale of the Pines Court property, applying the proceeds to the various obligations of the Kogan Affiliates. Accordingly, the Kogan Affiliates agreed to convey their interest in the property to Scharf by quitclaim deeds that were to be held in escrow by Transcontinental.

The Escrow Agreement incorporated a Sinking Fund Agreement, entered into by the Kogan Affiliates and Scharf Affiliates, and contemporaneously executed on July 25, 2005. By this agreement, the Kogan Affiliates agreed to establish a sinking fund, and to continue to fund that account on a monthly basis until it contained sufficient funds to pay certain enumerated obligations.[5] The sinking-fund account was to be managed by Transcontinental. According to Scharf's trial testimony, Kogan never provided the initial funds required to open the account, and no account in the name of the sinking fund was ever created as contemplated by the Sinking Fund Agreement and the Escrow Agreement.

The Escrow Agreement contained a power-of-attorney provision.[6] The agree-

---

**5.** The Escrow Agreement and Sinking Fund Agreement set forth the following nine obligations to be paid from the Sinking Fund: (1) all outstanding real estate taxes on the Pines Court property through 2005; (2) all outstanding subdivision fees with respect to the Pines Court property; (3) the difference between the payoff amount to Truman Bank and $400,000; (4) $35,000 to be used for a real estate commission on the sale of the Pines Court property to a third party; (5) all outstanding obligations that are or can be a lien on the Pines Court property; (6) an amount sufficient to cover certain attorneys' fees; (7) closing costs associated with the sale of the Pines Court property to a third party; (8) a fee of 1% of the sale price for Transcontinental; and (9) any other obligation owed by Kogan or a Kogan Affiliate company to Scharf or any Scharf Affiliate company.

**6.** Specifically, the Escrow Agreement states that the Kogan Affiliates:

> hereby appoint Escrow Agent [Transcontinental] their attorney-in-fact with respect to sale of the [Pines Court] property. Escrow Agent may freely sell and direct the proceeds of sale of the Property under said power of attorney fully as if it were Seller for all purposes. This document is constituted as a Power of Attorney in reliance upon and in accordance with (Missouri law) and therefore, without limitation as to other powers, this Power of Attorney may be utilized in transactions that convey or affect real estate. The undersigned hereby grants to the attorney in fact full power and

ment also referenced an attached document, entitled "Powers of the Attorney-in-fact," which further lists additional enumerated powers the attorney-in-fact possesses. This attached document is not signed. Scharf asserts he was acting pursuant to the Escrow Agreement's power-of-attorney provision, and the additional powers set forth in the attached document, when he engaged in the transactions at First Bank.

After executing the Escrow Agreement and Sinking Fund Agreement, the parties posted a redemption bond. Also, Kogan, his wife, and IPD Properties executed and delivered quitclaim deeds for the Pines Court property, purporting to transfer all their interest and rights in the property to Ron Scharf personally. These quitclaim deeds were initially held in escrow by Transcontinental.

In December of 2005, Alexander Kogan and IPD Properties reached an agreement with Truman Bank to refinance the debt encumbering the Pines Court Property. As a part of Kogan's settlement with Truman Bank, the bank agreed to cancel the prior foreclosure. As a result, on December 30, 2005, the redemption bond posted by Scharf was released by court order, the news of which Scharf learned in January of 2006.

### Scharf—Kogan Business Dispute; Temporary Restraining Order; Settlement

The relationship between Scharf and Kogan became strained during the spring of 2006. On March 2, 2006, Alexander Kogan and certain Kogan Affiliates issued a press release announcing an exclusive production agreement with ASATI for the construction of air-supported structures in Russia and its former Eastern Bloc allies. ASATI is a designer, manufacturer, and marketer of air-supported structures, and a chief competitor of the Scharf Affiliates. According to the press release, ASATI agreed to sell air-supported structures for use in Russia exclusively to the Kogan Affiliates.[7]

Three weeks after Kogan issued this press release, Kogan's attorney sent a letter to Scharf, proposing to pay Scharf a sum of money in exchange for his agreement to completely terminate the Escrow Agreement. This e-mail from Kogan's attorney to Scharf is time-dated 2:02 p.m., March 23, 2006. Less than two hours later, at 3:28 p.m., the quitclaim deeds to the Pines Court property, previously delivered to Scharf as a part of the Escrow Agreement and held in escrow by Transcontinental, were filed and recorded with the St. Louis County Recorder of Deeds. As a result, the official records reflected Scharf as the owner of the property.

Scharf and the Scharf Affiliates filed suit against Kogan and the Kogan Affiliates on April 12, 2006. In their petition, the Scharfs alleged that the Kogans had breached the exclusivity provisions of the May 3rd agreement by entering into a contract with the Scharfs' competitor, agreeing that the Kogan Affiliates would purchase all products to be sold in Russia from that competitor. Additionally, the Scharf Affiliates alleged the Kogans had breached the May 3rd agreement by failing and refusing to pay over 1.2 million dollars owed to the Scharf Affiliates for products supplied by the Scharfs. The

---

authority to do and perform every act necessary in order to carry out the authority granted in this document, just as fully as the undersigned might or could do if it, he or she were present and acting directly on its, his or her own behalf. . . .

7. A later press release, dated June 1, 2006, announced that a company belonging to Alexander Kogan had been awarded a contract to construct coverings over 64 stadiums to be built in Russia. The contract was said to be valued at 40 million dollars.

Scharfs noted their intent to file a demand for arbitration with the American Arbitration Association with respect to the various disputes they had with the Kogans, including but not limited to the breach-of-contract claim set forth in the petition.[8] In the meantime, the Scharf Affiliates requested that the court enter a preliminary injunction, enjoining the Kogan Affiliates from purchasing any products from any person or entity other than the Scharf Affiliates until such time that the arbitrator ruled on the dispute. The circuit court entered a temporary restraining order the following day, April 13th.

Kogan and Scharf settled their disputes with regard to this TRO lawsuit. The parties appeared in court on April 21st, and announced the terms of their settlement on the record. The parties' settlement required, among other things, that Kogan make a $1 million cash payment to Scharf. Additionally, Kogan agreed to give the Scharf Affiliates a certain amount of business going forward, in exchange for Scharf's release of a portion of the exclusivity requirement under the May 3rd agreement.

Kogan thereafter attempted to renegotiate the settlement and failed to meet his obligations under the settlement; Kogan did not even pay Scharf the first installment of the million-dollar cash payment. In all, Scharf testified that as of May 8, 2006, the Kogan Affiliates owed the Scharf Affiliates in excess of five million dollars.

When Kogan failed to perform his settlement obligations, Scharf elected not to return to court to seek enforcement of the settlement. Instead, he elected to proceed to several banks where he knew Kogan had accounts, for the express purpose of withdrawing funds out of Kogan's accounts. The first such bank he visited was First Bank. We now turn to the events critical to this appeal.

### Procurement of Cashier's Check from First Bank

On May 11, 2006, Scharf, accompanied by his attorney Duane L. Coleman, went to the Clayton branch of First Bank and carried out a series of banking transactions. Put summarily, Scharf established a new account, withdrew money out of a Kogan Affiliate bank account, deposited this withdrawn money into the newly-established account, and then procured a cashier's check using the funds from the newly-established and newly-funded account.

Upon entering First Bank, Scharf and Coleman were directed to Bradley Gross, a First Bank financial-services representative who was designated to open new accounts and to provide general account maintenance and customer service. Scharf indicated to Gross that he wished to open an account, and then to make a withdrawal. Using the February 21, 2005 Resolution that he had been given by Kogan, Scharf opened a new account in the name of "IPD Sales & Marketing, LLC," a Kogan Affiliate company. Scharf initially funded the new account by depositing a $100 check written on a Transcontinental account. Scharf designated himself as the sole signatory on the new account. And he signed the bank's signature card and limited liability company resolution for this account, identifying himself as the owner and member of IPD Sales & Marketing.

In conjunction with opening this new account, Scharf was provided a copy of First Bank's Deposit Account Agreement. This agreement between the bank and its customers sets forth the terms governing

8. The May 3rd Agreement, as well as the Escrow Agreement, and the Sinking Fund Agreement, provide that any dispute concerning the agreements be resolved by arbitration.

such matters as account deposits, including the bank's right to verify deposits and charge back accounts. The agreement also covers the availability of funds to the account-holder, and other matters attending deposit accounts, including the bank's rights if there is any uncertainty regarding the ownership of an account or its funds. The bank later relies on this deposit agreement in establishing its defense to payment of its cashier's check.

Once this new account was opened, Scharf told Gross that he wanted to make a withdrawal from all of the accounts that were owned or related to Alexander Kogan. Gross informed Scharf there was an account in the name IPD Capital, Inc., but that Scharf was not a signatory on the account. At this point, Scharf presented Gross with a "compendium" of documents, which included the February 1, 2005 Security Agreement, the Sinking Fund Agreement, and the Escrow Agreement (with Power of Attorney). Using this "compendium" of documents, attorney Coleman explained to Gross that Scharf had the authority to access and withdraw funds from any of Kogan's accounts, including the account in the name of IPD Capital. Scharf and Coleman did not tell Gross that Scharf had just been involved in litigation with Kogan, or that Kogan had failed to honor the settlement of the litigation. Scharf further testified that he did not tell Gross why he was withdrawing the money out of the IPD Capital account. Gross did not check with Alexander Kogan at this time, to verify Scharf's authority under the documents.

Gross added Scharf as a signatory on the IPD Capital account. He informed Scharf that there was approximately $664,000 in that account, and asked how much Scharf wanted to withdraw. Scharf asked Gross to transfer $650,000 from the IPD Capital account into the newly-opened account in the name of IPD Sales & Marketing. Gross prepared a check, inserting the name IPD Capital, Inc., the account number, the date, the amount, and made it payable to IPD Sales & Marketing. Scharf signed the check. Gross then took the check and a deposit slip to a teller, and deposited the check into the newly-opened IPD Sales & Marketing account.

The trial testimony conflicted as what occurred next. Scharf and Coleman testified that they expressly told Gross they wanted to obtain a cashier's check for the entire $650,000 that they had just transferred into the newly-opened IPD Sales & Marketing account. According to Scharf and Coleman, Gross facilitated the purchase of this cashier's check by instructing Scharf to use one of the starter checks from the newly-opened IPD Sales & Marketing account and to make the starter check payable to First Bank. The two men explained that Scharf filled out and signed the starter check as instructed and that Gross then took the starter check, accompanied them to the teller's counter, handed the starter check to the teller, and told the teller that Scharf needed to purchase a cashier's check for $650,000.

Gross denied this, and testified that at no time while Scharf and Coleman were in the bank was he told or did he otherwise know that Scharf intended to immediately withdraw the entire amount Scharf had just transferred to the IPD Sales & Marketing account. To the contrary, Gross testified that such information would have "definitely thrown up some red flags" for him. Instead, Gross testified that after the transfer of the $650,000 from the IPD Capital account to the newly-opened IPD Sales & Marketing account was complete, Scharf and Coleman asked him how they could obtain a cashier's check for a "small closing." According to Gross, someone, either Scharf or Coleman, mentioned they

needed $30,000 to $35,000. Gross testified he informed Scharf and Coleman that he was not authorized to issue cashier's checks and he directed the two men to the teller line for that transaction. According to Gross, he did not accompany Scharf and Coleman to the teller line. He testified that the two men were with the teller for a few minutes and then left the bank; and that it was only after the two men had left the bank that he discovered Scharf had withdrawn the entire $650,000 in the form of a cashier's check. It turned out that the First Bank teller had received a starter check from the newly-opened IPD Sales & Marketing account. Listing IPD Sales & Marketing as the purchaser, the teller had then prepared a cashier's check for $650,000, made payable to Transcontinental.

After procuring the cashier's check from First Bank, Scharf and Coleman then proceeded to Southwest Bank. Once there, Scharf opened a new account, in the name of Transcontinental, and deposited the cashier's check into this new account. Scharf then requested Southwest Bank to wire transfer $649,000 of the newly-deposited money. According to Scharf, he asked for the money to be wired to a Transcontinental money-market account in New York.

### Stop–Payment Order

Joseph Riganti, the branch manager for First Bank, testified that after Scharf and Coleman left First Bank, he approached Gross and asked him what transactions had occurred. Riganti reviewed the "compendium" of documents, and immediately noticed that a power of attorney was not signed. Riganti noticed that the documents also seemed to relate to a real-estate transaction. He then proceeded to the teller line to inquire what Scharf and Coleman had done. The teller informed Riganti that Scharf and Coleman had purchased a $650,000 cashier's check, using the funds in the newly-opened IPD Sales & Marketing account. At this point, Riganti stated he felt "horrible," because he realized the bank had added a customer onto an account that the account-holder had not authorized, that funds had been transferred out of that account, and a cashier's check then purchased for that entire amount. Riganti noted that he felt very uncomfortable because of the amount of money, and because they were disputed funds. Riganti explained that he then returned to Gross's desk and instructed him to call Alexander Kogan, the owner of the IPD Capital account from which funds had been taken. Gross called Kogan and was informed by Kogan that he believed the Escrow Agreement was no longer valid or in force, and that Scharf was not authorized to access any accounts of IPD Capital.

After speaking with Kogan, First Bank placed a stop-payment order on the cashier's check. Riganti stated he believed there were disputed funds and stopped payment on the cashier's check to protect the bank. Riganti and Gross then called Chris Travelstead, First Bank's fraud investigator, and explained the situation. Gross faxed his copy of the "compendium" of documents to Travelstead, who in turn instructed Gross and Riganti to contact Scharf, to let him know that First Bank needed to review the transaction, that the cashier's check would not be paid, and that Scharf should not negotiate the check.

Gross called Scharf on his cell phone, to inform him that First Bank had stopped payment on the cashier's check. Gross did not reach Scharf personally, but instead reached Scharf's voicemail. Gross left a message, asking Scharf to contact him. Gross and Riganti waited ten minutes, at which time Riganti himself placed another call to Scharf's cell phone. Scharf answered, and Riganti informed him that the

bank had placed a stop-payment order on the cashier's check. Scharf immediately handed his phone over to Coleman. Riganti repeated to Coleman that the bank had stopped payment on the cashier's check and stated that Scharf should not negotiate the check. According to Riganti's trial testimony, Coleman responded that this would create a problem because they were at a closing. The connection on the call was then lost and the call was terminated.

About an hour-and-a-half later, Scharf and Coleman returned to First Bank and met with Riganti. Coleman went through the "compendium" of documents with Riganti, explaining and interpreting different selected sections of those documents. Riganti testified at trial that he did not understand the documents. In the end, Riganti informed Scharf and Coleman that interpretation of the "compendium" of documents would be left to the bank's legal department. During the course of this conversation, Riganti mentioned to Coleman that the power of attorney, apparently in reference to the power attached to the Escrow Agreement, was not signed. According to Riganti, Coleman responded that he had shown Gross a signed copy. Riganti testified that he never saw a signed copy of that document.

After reviewing the "compendium" of documents with Riganti, Scharf and Coleman spoke via conference call with Travelstead, who indicated she also needed to review the documents. She informed Scharf and Coleman that the bank was going to set aside the cashier's check until a determination could be made regarding the disputed funds. During the course of this conversation, First Bank learned that Scharf had deposited the cashier's check at Southwest Bank. Travelstead immediately contacted David Holmes, Southwest Bank's security manager. Holmes located the cashier's check and stopped the wire transfer that had been requested by Scharf. Although Scharf and Coleman testified that Scharf had requested Southwest Bank to wire money to an account in New York, Holmes testified that Southwest Bank had received instructions to wire the funds to an off-shore account in the Bahamas.

First Bank referred the matter to its fraud investigation department, as well as outside counsel, for review. The bank and counsel concluded that the authority of Scharf to withdraw money from Kogan's IPD Capital account was disputed. First Bank then reversed the $650,000 deposit Scharf had made into to the newly-opened IPD Sales & Marketing account, and restored those funds to the IPD Capital account from which they had been withdrawn. Due to this adjustment, the newly-opened IPD Sales & Marketing account did not have sufficient funds to pay the check written on that account for the purchase of the cashier's check. Thus, the IPD Sales & Marketing check to First Bank was never paid. The funds were never released to Southwest Bank, and Transcontinental never received the $650,000. Transcontinental then initiated legal action against First Bank to compel payment of the cashier's check.[9]

9. In addition to Transcontinental's legal action against First Bank, the Scharf Affiliates and Kogan Affiliates proceeded to arbitration. On or about May 17, 2006, the Kogan Parties filed a Notice of Intent to Arbitrate with the American Arbitration Association (AAA), initiating arbitration proceedings against the Scharf Affiliates relating to the parties' disagreements. The Scharf Affiliates filed their own Demand for Arbitration with the AAA against the Kogan Affiliates. The arbitrator, Stephen H. Rovak, issued his award on August 10, 2007. In part, the arbitrator awarded the lost profits requested by the Scharf Affiliates, which exceeded $16,500,000, as well as damages on several other grounds,

### Action against First Bank; Trial

Transcontinental filed suit against First Bank, alleging that the bank had violated certain sections of Missouri's Uniform Commercial Code, in particular Section 400.3–412, when it refused to pay the cashier's check. Transcontinental argued that under Section 400.3–412, First Bank could not raise defenses to payment of the check, but instead was obligated to pay the cashier's check according to its terms at the time it was issued. The company contended that at the time the cashier's check was issued, sufficient funds existed in the newly-opened IPD Sales & Marketing account to cover the purchase of the cashier's check. Transcontinental sought actual damages of $650,000 plus consequential damages as provided for under Section 400.3–411 of Missouri's Uniform Commercial Code.

In bringing this action, Transcontinental maintains it was fully entitled to the funds in the IPD Capital account and any other account belonging to Kogan. The company contends its president, Ron Scharf, was acting pursuant to the power-of-attorney provisions set forth in the Escrow Agreement and its attachment. The company maintains that the various agreements included in the "compendium" of documents were in full force and effect on May 11, 2006, that the "cumulative" effect of those agreements authorized Scharf to engage in self-help remedies to collect on and pay certain debts owed by the Kogan Affiliates, and that this authority specifically included the power to withdraw funds from any Kogan Affiliate account at any financial institution.[10]

including damages based on the Sinking Fund Agreement and the Escrow Agreement. The arbitrator also made a number of findings regarding Mrs. Kogan's liability. He also declared that the Sinking Fund Agreement and the Escrow Agreement are "in full force" and that the Scharf Affiliates had not materially breached those agreements. On September 10, 2007, the Scharf Affiliates filed an application and motion to confirm the arbitration award in the Circuit Court of St. Louis County, Missouri. The Kogan Affiliates and Mrs. Kogan filed separate motions to vacate the arbitration award. At the time of trial in this instant case, March 2008, the arbitrator's award had yet to be confirmed by the court. The circuit court entered judgment on June 16, 2008, confirming the arbitration award as to some, but not all, parties; the court later entered judgment confirming the award as to all remaining parties. The Kogans appealed, alleging the trial court erred in two respects. First, the Kogan Affiliates and Mrs. Kogan contended the trial court erred in confirming the arbitration award because of the arbitrator's misconduct and error in refusing to grant the Kogan Affiliates' request for a "brief" postponement of the hearing. And second, Mrs. Kogan argued the trial court erred in confirming the arbitration award against her because the arbitrator did not have the authority to enter an award against her. This Court recently issued our decision in that case, affirming the judgment of the trial court as to the Kogan Affiliates and reversing as to Mrs. Kogan. *Scharf v. Kogan*, 285 S.W.3d 362 (Mo.App. E.D.2009).

10. In particular, Transcontinental cited provisions from the Security Agreement of February 1, 2005, the Sinking Fund Agreement, and the Escrow Agreement, as authority to access and withdraw funds from Kogan's IPD Capital account. Transcontinental argues that the Security Agreement secured the payment and performance of not only the then-existing obligations of the Kogan Affiliates to the Scharf Affiliates, including those incurred under the February 1st agreement and promissory note, but also all future obligations. Transcontinental points out that the Security Agreement describes the collateral as including "all bank accounts," and that a power-of-attorney provision contained within that agreement granted the Scharf Affiliates the right to collect the collateral in any way or at any time they sought fit. Transcontinental further argues that the Escrow Agreement and Sinking Fund Agreement appointed it as the Kogan Affiliates irrevocable attorney-in-fact with the responsibility of collecting funds and paying certain specified obligations. In particular, the company noted the attachment to the Escrow Agreement contained the following pow-

The parties waived a jury trial, and the matter was tried to the court.

### Judgment of Trial Court

The trial court entered judgment in favor of First Bank. The court first ruled that the bank could refuse to honor its cashier's check. In so ruling, the court acknowledged that a cashier's check is generally regarded as the equivalent of cash in the minds of the public and in the commercial world, and therefore, public policy does not favor a rule that permits stopping payment of cashier's checks. Citing this Court's decision in *Godat*, however, the trial court noted that in limited circumstances, an issuing bank may refuse to pay its cashier's checks when the bank is asserting its own defense against an individual who dealt with the bank in connection with the transaction or is otherwise not a holder in due course. *Godat v. Mercantile Bank of Northwest County*, 884 S.W.2d 1 (Mo.App. E.D.1994). The trial court further noted that courts have recognized a bank may dishonor its cashier's check where no consideration was given to the bank for the instrument. The court found that Section 400.3–412, upon which Transcontinental relied, neither addresses nor precludes defenses available to the issuer. Accordingly, the trial court concluded that First Bank could refuse payment and assert its own defense against liability on its cashier's check.

Continuing, the trial court then found that First Bank met its burden of proving its defense of lack of consideration. The court noted that in order to pay for the cashier's check, Scharf wrote a check payable to First Bank against the $650,000 provisional credit in the newly-opened IPD Sales & Marketing account. This IPD Sales & Marketing check, the court found, was never paid because First Bank reversed the provisional credit upon learning that Kogan disputed Scharf's authority to withdraw funds from IPD Capital's account and deposit those funds in the newly-opened IPD Sales & Marketing account. The trial court held that the bank was entitled to reverse the transfer of funds based on its deposit agreement with IPD Sales & Marketing. The reversal of the provisional credit thus left no available funds in the new account with which to pay the check Scharf wrote to First Bank to purchase the cashier's check. Because the

ers granted to Transcontinental as attorney-in-fact for the Kogan Affiliates:

> (e) ... to withdraw money or securities from any financial institution and to sign or endorse any instrument to effect such withdrawals;
>
> ...
>
> (j) Engage in, do and transact all and every kind of business in which Seller [the Kogan Affiliates] and or Kogan may hereafter be interested in such manner as the attorney in fact may think proper....

Additionally, Transcontinental contends the Sinking Fund Agreement authorized it to "seek, obtain and take control of for the [Sinking Fund] any other monies it may find that are due to [the Kogan Affiliates] from any source...." Similarly, it claims that the Escrow Agreement gave Scharf "the right to redirect or impound funds for the Sinking Fund that otherwise would be due to Kogan or to companies owned or controlled by Kogan and Kogan's affiliates until the Sinking Fund is fully funded." The company further argues that the Sinking Fund and Escrow Agreements provide that Transcontinental could pay the obligations of the Sinking Fund in whole or in part at any time, in the company's sole discretion.

In sum, Scharf maintains that he was collecting money from Kogan's accounts, to discharge Kogan's various obligations, as contemplated by and provided for in the Sinking Fund Agreement. We note that although Scharf contends he was acting in furtherance of that agreement, the newly-created account at First Bank was not in the name of the sinking fund. Nor was the account at Southwest Bank. And the cashier's check did not refer to Transcontinental's status as designated escrow agent and manager of the sinking fund.

check drawn on the provisional credit of IPD Sales & Marketing was never paid, First Bank was never paid for the cashier's check and thus no consideration was given for the cashier's check.

Because First Bank was never paid for the cashier's check, the trial court found the bank could successfully assert its personal defense of lack of consideration to the payment of the cashier's check, and avoid liability on the check, provided Transcontinental had either dealt with First Bank in connection with the purchase of the cashier's check or was not a holder in due course. As to the first of these circumstances, the trial court found that Transcontinental and Scharf were involved in the transactions from start to finish, and thus dealt with First Bank in connection with the transaction. As to the second of these circumstances, the trial court held that Transcontinental failed to establish its status as a holder in due course because it did not give value for the cashier's check; it did not take the check in "good faith" from IPD Sales & Marketing; and it did not take the cashier's check without notice of the facts giving rise to First Bank's defense of lack of consideration. Accordingly, Transcontinental was subject to the bank's defense, and thus, because the bank had proven its defense, First Bank was not liable to Transcontinental for the amount of the cashier's check.

As to Scharf's contention that he was acting under the authority granted to him in the various agreements, the trial court found the agreements ambiguous and susceptible to various interpretations. Additionally, the trial court noted there was conflicting testimony at trial as to whether those agreements were still in effect on May 11, 2006.

Lastly, the court concluded that First Bank had reasonable grounds to believe it had a valid defense to the payment of the cashier's check, and thus, Transcontinental was not entitled to consequential damages and expenses under Section 400.3–411.

### Appeal

Transcontinental appeals, alleging multiple points of trial-court error. Four of these points challenge conclusions reached by the trial court in its judgment. Transcontinental contends the trial court erred in determining (1) that First Bank was allowed to stop payment of the cashier's check; (2) that lack of consideration is a viable defense to the payment of a cashier's check; (3) that Transcontinental was not a holder in due course; and (4) that Transcontinental was not entitled to consequential damages and expenses. Transcontinental's final point on appeal challenges the trial court's evidentiary ruling at trial, excluding information regarding the arbitration award issued on August 10, 2007.

### *Standard of Review*

 As this is a court-tried case, our review is pursuant to the principles articulated in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976); *Bd. of Educ. of St. Louis v. Missouri State Bd. of Educ.*, 271 S.W.3d 1, 7 (Mo. banc 2008); *Missouri Land Dev. Specialties, LLC v. Concord Excavating Co., L.L.C.*, 269 S.W.3d 489, 496 (Mo.App. E.D.2008). This Court will affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32. We consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of all reasonable inferences. *Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*, 279 S.W.3d 179, 184 (Mo. banc 2009). We

disregard all contradictory evidence and inferences. *Id.*

In reviewing a court-tried case, we give due regard to the opportunity of the trial court to have judged the credibility of witnesses. Rule 84.13(d)(2). The trial court is in a superior position "not only to judge the credibility of witnesses and the persons direction, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." *Essex Contracting, Inc. v. Jefferson County,* 277 S.W.3d 647, 652 (Mo. banc 2009)(internal quotation omitted). The trial court is free to believe or disbelieve all, part, or none of the testimony given by any witness. *Hale v. Hale,* 180 S.W.3d 85, 89 (Mo.App. E.D.2005). And, the trial court may disbelieve testimony even when it is uncontradicted. *McAllister v. McAllister,* 101 S.W.3d 287, 291 (Mo.App. E.D.2003). Accordingly, we defer to the trial court on factual issues. *Essex Contracting,* 277 S.W.3d at 652. We afford the trial court no such deference, however, when reviewing its conclusions of law. *Missouri Land Dev. Specialties,* 269 S.W.3d at 496. Instead, we independently evaluate whether the trial court properly declared or applied the law to the facts presented. *Id.*

### Discussion

### Bank's Right to Dishonor Cashier's Checks

At the very heart of this appeal is the question of whether a bank may dishonor its cashier's check and assert a defense to its payment. Transcontinental contends that a bank should be absolutely prohibited from such conduct. It asserts that cashier's checks are unique among the various types of negotiable instruments, virtually the equivalent of cash. Transcontinental thus argues that the protection of the unique nature and usage of cashier's checks requires that cashier's checks be impervious to dishonor. First Bank, on the other hand, contends that a bank should be able to dishonor a cashier's check and assert the defense of failure of consideration in a later action for recovery by the payee of the cashier's check when the payee is not a holder in due course, or has dealt directly with the bank. In order to address these contentions, we consider the characteristics and historical treatment of cashier's checks.

### General Discussion of Commercial Paper, the Uniform Commercial Code, and Checks

Commercial paper, which includes negotiable instruments, is a vital component of the capitalistic economy in this and other nations. *Godat,* 884 S.W.2d at 3; *American Federal Sav. & Loan Ass'n v. Madison Valley Properties, Inc.,* 288 Mont. 365, 958 P.2d 57, 61 (1998). It is the means by which commerce is transacted. *American Federal,* 958 P.2d at 61. Rules governing commercial transactions, including the issuance, utilization, honoring and dishonoring of commercial paper, have developed over time. Many of our present-day rules find their origins in medieval times and the Law Merchant of England. *Id.; Godat,* 884 S.W.2d at 3; *see generally* Henry J. Bailey, Brady on Bank Checks ¶ 1.2 (6th ed.1987). In more recent times, as interstate business increased in this country and court-made law respecting commercial paper evolved, efforts to harmonize the laws of sales and other commercial transactions resulted in such proposed laws as the Uniform Sales Act and the Uniform Negotiable Instruments Law. *See generally* Bailey, *supra,* ¶¶ 1.4 and 1.6. These uniform laws were adopted by many states in the early 1900s. The enacted versions still varied, however, from state to state. *See generally* Lary Lawrence, *Making*

*Cashier's Checks and Other Bank Checks Cost–Effective: A Plea for Revision of Articles 3 and 4 of the Uniform Commercial Code,* 64 Minn. L.Rev. 275, 277 (1980). The National Conference of Commissioners on Uniform State Laws and the American Law Institute then joined forces in a further attempt to introduce uniformity into state laws affecting business and commerce. Judges, lawyers, and top legal scholars from across the country collaborated and developed the model Uniform Commercial Code (UCC), a comprehensive collection of modernized and standardized laws designed to regulate the use of commercial paper as well as most other aspects of commercial enterprise. *See generally* Bailey, *supra,* ¶ 1.6. Article 3 of the UCC, which governs commercial paper, incorporates and replaces the previous Uniform Negotiable Instruments Law. 5 Ronald A. Anderson, Anderson on the Uniform Commercial Code § 3–101:4 (3d ed.1984); Lawrence, *supra,* 64 Minn. L.Rev. at 277. Missouri adopted its version of the Uniform Commercial Code in 1965; the General Assembly then revised numerous sections of Missouri's UCC in 1992.[11] The transaction at First Bank at issue here is governed by the provisions of Missouri's UCC, and in particular by the laws pertaining to negotiable instruments codified in Chapter 400, Article 3 of the Missouri Statutes.[12]

The UCC recognizes four basic types of negotiable instruments: notes, drafts, checks, and certificates of deposit.[13] Section 400.3–104. To be a negotiable instrument, the writing must meet certain statutorily-defined requirements, at the heart of which is an unconditional promise or order to pay a fixed amount of money. Section 400.3–104(a).[14] A "check," as that term is defined under the UCC, is a draft drawn on a bank and payable on demand. Section 400.3–104(f).[15] A "check" under the UCC also encompasses a cashier's check. Section 400.3–104(f).

Essentially, a check is a three-party instrument when originally issued. Bailey,

11. The National Conference of Commissioners on Uniform State Laws and the American Law Institute revised Article 3 of the UCC in 1990 and 1991. *See generally* Brian J. Davis, *The Future of Cashier's Checks under Revised Article 3 of the Uniform Commercial Code,* 27 Wake Forest L.Rev. 613, 614 (1992).

12. All statutory references to Missouri's UCC (noted as Section 400.——) are to RSMo 2000 unless otherwise indicated.

13. An instrument is a "note" if it is a promise and is a "draft" if it is an order. Section 400.3–104(e).

14. Subject to certain statutorily-defined exceptions that are not relevant here, Missouri's UCC defines a "negotiable instrument" as:
an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
(1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

(2) is payable on demand or at a definite time; and
(3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.
Section 400.3–104(a).

15. Section 400.3–104(f), in its entirety, states that a "check" means:

(i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or teller's check. An instrument may be a check even though it is described on its face by another term, such as "money order."

*supra*, ¶ 1.10. The parties to a check are the "drawer," the "payee," and the "drawee," sometimes referred to as the "payor bank." *Id.* The payee in possession of the check when it is issued or any person to whom the check is delivered by proper indorsement or negotiation is called the "holder." *Id.* To more fully explain, a check is an order addressed by one party to the instrument called the drawer, whose signature will appear on the instrument, usually in the lower right-hand portion of the instrument, directing a bank, the drawee, to pay on demand a certain stated fixed sum of money to a third party, called the payee, and whose name will appear in the body of the instrument. Section 400.3–104; 2 Alphonse M. Squillante & John R. Fonseca, The Law of Modern Commercial Practices § 5:7 (Rev. Ed.1981); *Environmental Quality Research, Inc. v. Boatmen's Nat'l Bank of St. Louis,* 775 S.W.2d 199, 203 (Mo.App. E.D.1989).

 There are essentially two classes of checks in general use: ordinary checks and bank checks, which is a general term that is used to refer to a variety of instruments, including cashiers checks.[16] *Stringfellow v. First Am. Nat. Bank,* 878 S.W.2d 940, 942–43 (Tenn.1994); Lawrence, *supra,* 64 Minn. L.Rev. at 278. Ordinary checks and bank checks are alike in that they are both intended to be used as a means for making immediate payment, not as a credit device or evidence of an indebtedness. Lawrence, *supra,* 64 Minn. L.Rev. at 278–79. "Their common advantage over cash is that they enable parties to transfer funds with less risk of theft or other loss." *Id.* at 279. There are certain differences, however, between the two classes of checks. An ordinary check is a draft drawn upon a bank by someone other than the bank. *Stringfellow,* 878 S.W.2d at 942; Lawrence, *supra,* 64 Minn. L.Rev. at 278. It is an order upon a bank directing the bank to pay a sum certain amount of money from a deposit of funds to the person named or to order or bearer on demand. *Crunk v. State Farm Fire Cas. Co.,* 106 Wash.2d 23, 719 P.2d 1338, 1339 (1986); 2 Squillante & Fonseca, *supra,* § 5:7. Banks are not liable on these checks unless they accept or pay them. Lawrence, *supra,* 64 Minn. L.Rev. at 278. "The drawer of the ordinary check has the power of countermanding his order for payment at any time before the bank has paid it or committed itself to pay it." *Crunk,* 719 P.2d at 1339; *see also* 5 Anderson, *supra,* § 3–104:23. Although ordinary checks offer an advantage over cash, certain risks attend the use of ordinary checks. For one, the drawer of the check may not have adequate funds to cover the check. And secondly, the drawer may stop payment on the check. Lawrence, *supra,* 64 Minn. L.Rev. at 279.

 A cashier's check, in contrast, is a draft drawn by a bank upon itself.[17] *State ex rel. Chan Siew Lai v. Powell,* 536 S.W.2d 14, 16 (Mo. banc 1976); *see also* 5 Anderson, *supra,* § 3–104:32; Lawrence, *supra,* 64 Minn. L.Rev. at 278. "The bank is both drawer and drawee." *Godat,* 884 S.W.2d at 3. "A cashier's check is the obligation of the bank, rather than of the depositor as is the case in an ordinary check...." 5 Anderson, *supra,* § 3–104:32, at 218. A cashier's check is paid from the issuing bank's own resources, rather than from a specific deposit balance, as is the

---

**16.** Other examples of bank checks are certified checks and teller's checks. Lawrence, *supra,* 64 Minn. L.Rev. at 278.

**17.** Missouri's UCC states that a "cashiers check" means "a draft with respect to which the drawer and drawee are the same bank or branches of the same bank." Section 400.3–104(g).

case with ordinary checks. *Moon Over the Mountain, Ltd. v. Marine Midland Bank*, 87 Misc.2d 918, 386 N.Y.S.2d 974, 975 (N.Y.Civ.Ct.1976); *see also Chan Siew Lai*, 536 S.W.2d at 16 (noting cashier's check paid from bank's own assets); *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill.2d 560, 329 Ill.Dec. 1, 905 N.E.2d 839, 843 (2009)(stating: "a cashier's check is not an item drawn on the customer's account"); 5 Anderson, *supra*, § 3–104:32. "When a bank issues a cashier's check, it promises the purchaser that the check will be paid from the bank's resources, not from the purchaser's account, upon presentation." 9 C.J.S. *Banks and Banking* § 486 at 439–40 (2008). "Because the bank serves as both the drawer and the drawee of the cashier's check, the check becomes a promise by the bank to draw the amount of check from its own resources and to pay the check upon demand." *Flatiron Linen, Inc. v. First Am. State Bank*, 23 P.3d 1209, 1212 (Colo.2001). Cashier's checks are often used in dealings in which the use of ordinary checks presents too great a risk of insufficient funds to cover the check or of payment being stopped by the drawer of the check. David J. Benson, *Stop Payment of Cashier's Checks and Bank Drafts Under the Uniform Commercial Code*, 2 Ohio N.U. L.Rev. 445, 446 (1975); *see also* Lawrence, *supra*, 64 Minn. L.Rev. at 281; 2 Squillante & Fonseca, *supra*, § 5:7, at 31.

A cashier's check is issued when a purchaser, called the "remitter," pays the issuing bank a consideration. An authorized officer of the bank then makes the cashier's check, made payable to the order of another as payee and signed by the cashier or other authorized bank official. The bank issues the cashier's check to the purchaser who then delivers it to the payee. 2 Squillante & Fonseca, *supra*, § 5:7, at 31. The cashier's check evidences the fact that the payee is "authorized to demand and receive from the bank, upon presentation, the amount of money represented by the check." 5 Anderson, *supra*, § 3–104:32, at 218.

*Pre–Revision Approaches to Question of Whether a Bank May Dishonor Its Cashier's Checks*

Pre-revision Article 3, still in effect in a number of jurisdictions, does not specifically address cashier's checks. *See generally* Lawrence, *supra*, 64 Minn. L.Rev. at 281; *see also* 6 William D. Hawkland & Lary Lawrence, Uniform Commercial Code Series § 3–411:1 (Rev. Art. 3)(1999). And pre-revision Article 3 contains no definitive answer to the question of whether a bank may dishonor its own cashier's check and assert a defense to payment of that check. *Stringfellow*, 878 S.W.2d at 943; *see also* Lawrence, *supra*, 64 Minn. L.Rev. at 285–86 (noting the Code's failure to set forth the rights and liabilities of the parties to a cashier's check).

Courts have divided sharply over the issue, basically adopting two distinctly different approaches, commonly referred to as the "cash equivalent" approach and the "ordinary negotiable instrument" approach. *See generally Stringfellow*, 878 S.W.2d at 943; *Warren Fin., Inc. v. Barnett Bank of Jacksonville, N.A.*, 552 So.2d 194, 196 (Fla.1989); *Da Silva v. Sanders*, 600 F.Supp. 1008, 1011 (D.D.C.1984); *Santos v. First Nat'l State Bank of New Jersey*, 186 N.J.Super. 52, 451 A.2d 401, 405 (N.J.Super.Ct.App.Div.1982); Lawrence, *supra*, 64 Minn. L.Rev. at 285–320; 6 Hawkland & Lawrence, *supra*, § 3–411:1 (Rev. Art. 3). Courts following the "cash equivalent" approach, as we would expect, treat cashier's checks as the equivalent of cash, and hold that once a bank has issued a cashier's check, it may not later refuse to honor the check. Courts following the "ordinary negotiable instrument" approach

treat cashier's checks as ordinary negotiable instruments, and hold that banks may refuse payment on their cashier's checks in limited circumstances. *See generally, Warren*, 552 So.2d at 196; Lawrence, *supra*, 64 Minn. L.Rev. at 286; 6 Hawkland & Lawrence, *supra*, § 3–411:1 (Rev. Art. 3).

The "cash equivalent" approach is premised largely upon policy considerations stemming from the nature and usage of cashier's checks in the commercial world. Courts adopting this approach note that cashier's checks play a significant role in commercial practices by furthering certainty in commercial transactions. *Da Silva*, 600 F.Supp. at 1013; *Flatiron*, 23 P.3d at 1213; see generally *Warren*, 552 So.2d at 196. As noted by one court:

> Cashier's checks play a unique role in the American economy because they are widely recognized as cash equivalent. The public uses cashier's checks because they are a reliable vehicle for transferring funds, are as negotiable as cash, and are free of the risks of loss and theft that accompany cash.

*Flatiron*, 23 P.3d at 1213 (internal quotation omitted). The rationale behind the "cash-equivalent" approach is succinctly summarized by the New Jersey Supreme Court in its *National Newark* decision:

> A cashier's check circulates in the commercial world as the equivalent of cash. People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual. In effect the bank becomes a guarantor of the value of the check and pledges its resources to the payment of the amount represented upon presentation. To allow the bank to stop payment on such an instrument would be inconsistent with the representation it makes

in issuing the check. Such a rule would undermine the public confidence in the bank and its checks and thereby deprive the cashier's check of the essential incident which makes it useful. People would no longer be willing to accept it as a substitute for cash if they could not be sure that there would be no difficulty in converting it to cash.

*Nat'l Newark & Essex Bank v. Giordano*, 111 N.J.Super. 347, 351–52, 268 A.2d 327 (1970). Accordingly, due to the nature and usage of cashier's checks in the commercial world, courts reason that public policy requires a rule which prohibits a bank from refusing to honor its cashier's checks. *See, e.g., Id.* at 351; *Able & Associates., Inc. v. Orchard Hill Farms of Illinois, Inc.*, 77 Ill.App.3d 375, 32 Ill.Dec. 757, 395 N.E.2d 1138, 1142 (1979); *Kaufman v. Chase Manhattan Bank, Nat'l. Ass'n*, 370 F.Supp. 276, 278–79 (S.D.N.Y.1973).

To preserve the cash-like attributes of cashier's checks, most courts adopting the "cash-equivalent" take the position that a cashier's check is an accepted draft. *See generally Warren*, 552 So.2d at 196; Lawrence, *supra*, 64 Minn. L.Rev. at 289. The courts then ignore the Code provisions that allow obligors on ordinary negotiable instruments to escape liability; instead, the courts impose an absolute obligation on the issuing banks, prohibiting them from raising any defenses to payment. *See generally* Lawrence, *supra*, 64 Minn. L.Rev. at 289; 6 Hawkland & Lawrence, *supra*, § 3–411:1 (Rev. Art. 3). In so doing, the courts cite the widely-quoted pre-Code rule that a cashier's check is accepted upon issuance. *See generally Stringfellow*, 878 S.W.2d at 944; *Warren*, 552 So.2d at 196; *Da Silva*, 600 F.Supp. at 1012. The courts further cite to a stop-payment order provision in Article 4, specifically section 4–303,[18] which basically provides that a stop-payment order comes too late if received

---

18. Pre-revision Section 400.4–303 RSMo 1986, entitled "**When item subject to notice,**

after the bank has accepted or certified an item.[19] *Id.* From these two rules, courts hold that a bank may not refuse to honor or stop payment on a cashier's check because that check has been accepted upon issuance and section 4–303 prohibits stop-payment orders on accepted items. *Id.* Therefore, a bank may not assert a defense and refuse to honor its cashier's check when presented for payment. *Id.*[20]

Courts following the "ordinary negotiable instrument" approach also recognize the need to uphold the cash-like attributes of cashier's checks. *See generally War-ren,* 552 So.2d at 197. Nevertheless, courts following this approach hold that under limited circumstances a bank may be allowed to refuse payment on its cashier's check without incurring liability. *Id.*

Courts offer different underlying analyses in their treatment of cashier's checks as ordinary negotiable instruments. Although in agreement on their view of cashier's checks as an ordinary negotiable instrument, the courts diverge on the precise nature of the cashier's check. Lawrence, *supra,* 64 Minn. L.Rev. at 286–87; *see also, Da Silva,* 600 F.Supp. at 1011. Some courts consider the cashier's check as similar to a promissory note, viewing the bank as the note's maker. *Id.* These courts rely on section 3–118(a) which states that "[a] draft drawn on the drawer is effective as a note." Lawrence, *supra,* 64 Minn. L.Rev. at 287; *see also, Da Silva,* 600 F.Supp. at 1011.[21] Other courts consider the cashier's check as similar to an accepted draft, viewing the bank as the acceptor. Lawrence, *supra,* 64 Minn. L.Rev. at 286–87; *see also, Da Silva,* 600 F.Supp. at 1011. These courts point out, however, that under section 3–413, the obligations of a mak-

stop-payment order—legal process or setoff—order in which items may be charged or certified," provides in pertinent part:

(1) Any knowledge, notice or stop-order received by legal process served upon or set-off exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend or modify such right or duty if the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the bank has done any of the following:

(a) accepted or certified the item; . . . .

19. "Accepted" as that term is used in Article 4 of Missouri's UCC means "acceptance," as that term is defined in Article 3 of Missouri's UCC. *Chan Siew Lai,* 536 S.W.2d at 16. " 'Acceptance is the drawee's signed engagement to honor the draft as presented.' " *Id.* (quoting Section 400.3–410(1) RSMo 1969). Under Missouri's Revised UCC, "acceptance" means:

the drawee's signed agreement to pay a draft as presented. It must be written on the draft and may consist of the drawee's

signature alone. Acceptance may be made at any time and becomes effective when notification pursuant to instructions is given or the accepted draft is delivered for the purpose of giving rights on the acceptance to any person

Section 400.3–409(a).

20. See also, e.g., *Able,* 32 Ill.Dec. 757, 395 N.E.2d at 1142; *Kaufman,* 370 F.Supp. at 278; *Nat'l Newark,* 111 N.J.Super. at 351, 268 A.2d at 328; *First Fin. L.S.L.A. v. First Am. Bank & Trust Co.,* 489 So.2d 388, 391 (La.Ct. App.1986); *Yukon Nat'l Bank v. Modern Builders Supply, Inc.,* 686 P.2d 307, 309 (Okla.Ct.App.1984); *Wertz v. Richardson Heights Bank & Trust,* 495 S.W.2d 572, 574 (Tex.1973).

21. See also, e.g., *John Deere Co. v. Boelus State Bank,* 233 Neb. 818, 448 N.W.2d 163, 165 (1989); *Laurel Bank & Trust Co. v. City Nat'l Bank of Connecticut,* 33 Conn.Supp. 641, 365 A.2d 1222, 1224 (1976); *Banco Ganadero Y Agricola v. Society Nat'l Bank of Cleveland,* 418 F.Supp. 520, 523–24 (N.D.Ohio 1976); *TPO Inc. v. Federal Deposit Ins. Corp.,* 487 F.2d 131, 135 (3d Cir.1973).

er and an acceptor are identical.[22] Lawrence, *supra,* 64 Minn. L.Rev. at 287–88; *see also, Da Silva,* 600 F.Supp. at 1011. Thus, the courts reason, because makers are subject to the provisions of sections 3–305 and 3–306, a bank's liability on cashier's checks should also be governed by those sections. *Id.*[23]

Other courts following the "ordinary negotiable instrument" approach do not rely on any UCC provisions, but instead rely on principles of equity. *Pulaski Chase Co-op. v. Kellogg–Citizens Nat'l Bank,* 130 Wis.2d 200, 386 N.W.2d 510, 512 (1986). And still others simply reason that "nothing in the U.C.C. suggests that cashier's checks should be treated differently from other instruments subject to Articles 3 and 4." *Farmers & Merchants State Bank v. Western Bank,* 841 F.2d 1433, 1440 (9th Cir. 1987); *American Federal,* 958 P.2d at 61–2.

Regardless of their underlying reasoning, the courts ultimately reach the same result. Courts adopting the "ordinary negotiable instrument" turn to sections 3–305 and 3–306, the UCC provisions governing the liability of obligors on notes and ordinary checks, and determine a bank's liability on its cashier's check based on the status of the holder of that check. *See generally Warren,* 552 So.2d at 198; *Stringfellow,* 878 S.W.2d at 943; *see also* Lawrence, *supra,* 64 Minn. L.Rev. at 286–87. If the payee or endorsee of a cashier's check is determined to be a holder in due course, courts limit the bank's defenses to those defenses "real" to the bank. *See generally, Warren,* 552 So.2d at 198. On the other hand, if a payee or endorsee of a cashier's check is determined to be a non-

holder in due course, courts permit the bank to assert its "real" and "personal" defenses. *Id.*

Both the "cash equivalent" approach and the "ordinary negotiable instrument" approach have drawn criticism. Several courts and commentators have criticized the "cash equivalent" approach and the courts' reliance on the stop-payment provision contained in section 4–303. The critics contend that the concept of stopping payment has relevance only to relations between a bank and its customer who draws a check against the bank, and that the section does not apply to a cashier's check. The critics note that section 4–303 governs a customer's right to place a stop-payment order on the customer's check, and the bank's resulting liability to its customer for failing to stop payment. Because the bank, as drawer and drawee, is its own customer when it issues a cashier's check, it is nonsensical, the critics argue, to speak of the bank's liability to itself for failing to stop payment on its own cashier's check. Lawrence, *supra,* 64 Minn. L.Rev. at 292 n. 59; *see also* Benson, *supra,* 2 Ohio N.U. L.Rev. at 448; *see generally, Stringfellow,* 878 S.W.2d at 944; *Da Silva,* 600 F.Supp. at 1012; *see also, e.g., Warren,* 552 So.2d at 197; *Rezapolvi v. First Nat'l Bank of Maryland,* 296 Md. 1, 459 A.2d 183, 188 n. 7 (1983).

Courts and commentators have also criticized the "ordinary negotiable instrument" approach as flawed because the code provisions, upon with the courts rely, were not designed to govern cashier's checks. *See generally Stringfellow,* 878 S.W.2d at 944; *Da Silva,* 600 F.Supp. at

---

**22.** The pre-revision section 3–413, upon which the courts rely, reads: "The maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement...." *See Da Silva,* 600 F.Supp. at 1011.

**23.** See also, e.g., *Santos,* 451 A.2d at 407; *Rezapolvi v. First Nat'l Bank of Maryland,* 296 Md. 1, 459 A.2d 183, 188 (1983).

1011–12. Neither section 3–118(a) nor section 3–413, upon which the courts rely, was drafted "with the aim of specifying the defenses available to obligors." Lawrence, *supra,* 64 Minn. L.Rev. at 288.

### Missouri's Approach to the Question

Missouri courts have addressed the issue of whether a bank may refuse payment and defend against liability on its cashier's check on but a few occasions. In *Chan Siew Lai,* the Missouri Supreme Court confronted a situation where the purchaser requested that the bank dishonor its cashier's check because of fraud practiced upon the purchaser by the payee. Citing public-policy considerations attendant to the unique nature and usage of cashier's checks in the commercial world, the Court held that because issuance of the check was acceptance by the issuing bank, the stop-payment provisions of Section 400.4–303 came into play and the bank could not stop payment after issuance. *Chan Siew Lai v. Powell,* 536 S.W.2d 14, 16 (Mo. banc 1976).

In *Environmental Quality Research,* the holder of a cashier's check brought action against the issuing bank for dishonoring the check. *Environmental Quality Research, Inc. v. The Boatmen's Nat'l Bank of St. Louis,* 775 S.W.2d 199 (Mo. App. E.D.1989). This Court was presented with the issue of whether, in view of the ruling in *Chan Siew Lai,* an issuing bank could dishonor its own cashier's check. We concluded that a bank could do so under very limited circumstances. *Environmental Quality Research,* 775 S.W.2d at 204. This Court distinguished *Chan Siew Lai* where the purchaser of the cashier's check attempted to stop payment of the check and assert defenses against the payee of the check. By contrast, in *Environmental Quality Research,* it was the issuing bank that dishonored the check, asserting its own defenses to payment of

the check. The difference may seem subtle, but is very important.

In *Environmental Quality Research,* we held that Section 4–303, upon which the court relied in *Chan Siew Lai,* did not prevent the bank from asserting its defenses. Section 4–303 and the stop-payment language contained therein, we observed, relate to a customer's effort to stop payment of an item drawn on the customer's account. We noted, however, that when a bank issues a cashier's check, the check becomes the primary obligation of the bank, rather than the purchaser, payable from the bank's own assets. Section 4–303 prevents the purchaser of a cashier's check from stopping payment on a cashier's check because it is not the purchaser's check. Such was the situation in *Chan Siew Lai,* wherein the court concluded that the purchaser had no authority to countermand a cashier's check because of fraud allegedly practiced on the purchaser by the payee. *Id.*

Section 4–303, we found, does not apply to an instrument drawn by a bank upon itself. We found that the text and comments reveal that the section was designed to set the relative priorities of conflicting claims to a customer's account, not to cut off a bank's right to assert its own defenses against an instrument. In sum, we found that Section 4–303 was "simply not intended to govern a bank's ability to assert its own defenses to liability on a cashier's check." *Id.* (citing *Farmers & Merchants,* 841 F.2d at 1440).

In reaching our decision, we also adopted the following language from the Maryland court:

> Despite the language in some opinions suggesting that a bank may never dishonor its cashier's check, courts have recognized that a bank may do so under very limited circumstances. These are where the holder has dealt with the

bank in connection with the transaction or is not a holder in due course, and where the cashier's check was obtained by fraud upon the bank or, under certain circumstances, where there was no consideration given to the bank for the instrument.

*Rezapolvi*, 459 A.2d at 188–89. Accordingly, we held that the issuing bank was not prevented from asserting its defenses, and had done so by virtue of its dishonorment. *Environmental Quality Research*, 775 S.W.2d at 205.

Perhaps recognizing the differences between *Chan Siew Lai* and *Environmental Quality Research*, Transcontinental attempts to bring itself within the purview of the *Chan Siew Lai* case and its holding by arguing that First Bank dishonored the cashier's check at the behest of its customer and the purchaser of the cashier's check, IPD Sales & Marketing. We are not persuaded. First Bank did not dishonor the cashier's check in order to assert a defense belonging to IPD Sales & Marketing. Instead, First Bank has raised its own personal defense to paying the cashier's check, that being failure of consideration. *Chan Siew Lai* does not apply here.

We reaffirmed the teachings and holdings of *Environmental Quality Research* in our *en banc* decision, *Godat v. Mercantile Bank of Northwest County*, 884 S.W.2d 1 (Mo.App. E.D., en banc, 1994). In *Godat*, as in the preceding case, the bank that had issued a cashier's check later dishonored that check, asserting its own defenses. The *Godat* case involved a check-kiting scheme. The payee and holder of the cashier's check, David Godat, had transacted business for a number of years with his stockbroker, Kevin Hasty. Hasty, however, misrepresented to Godat that Godat's investments were profitable and that Godat's investment balance was over $500,000. Hasty then presented a new investment opportunity to Godat, who agreed to transfer $200,000 from his investment 'account' with Hasty to this new investment. To accomplish this, Hasty was to obtain a cashier's check in that amount payable to Godat. Hasty went to Mercantile Bank and opened an account in the name of Colonial Investors. He then deposited into that account a check for $221,545 drawn on United Missouri Bank. Hasty then purchased a $200,000 cashier's check from Mercantile payable to Godat. Hasty paid for this cashier's check with a check drawn to cash from the newly-opened Colonial Investors account. He then delivered the check to Godat. Later that same day, United Missouri Bank informed Mercantile that it was dishonoring the check Hasty had deposited in the Colonial Investors account. Mercantile contacted Godat to advise him that Hasty had insufficient funds to cover his purchase of the cashier's check. The bank then dishonored the cashier's check.

Godat brought action against Mercantile to recover the face amount of the dishonored cashier's check. The jury returned a verdict in favor of Godat; the trial court, however, granted Mercantile's motion for judgment notwithstanding the verdict on the basis that Godat was not a holder in due course because he had not given value for the check, and was therefore subject to any viable defenses of Mercantile, including fraud and theft by Hasty in obtaining the check through his check-kiting actions.

Godat appealed, and like Transcontinental here, argued that a bank can never stop payment on its cashier's check. This Court's majority flatly rejected that position, stating "[i]t is clear from *Environmental Quality Research* that in Missouri a bank may under limited conditions dishonor its cashier's check." *Godat*, 884 S.W.2d at 4. After finding that Mercantile

was entitled to dishonor its cashier's check and assert its defenses to payment of that check, we found that the cashier's check had been obtained by Hasty's fraud. The remainder of our discussion in *Godat* addressed the question of Godat's holder-in-due-course status and whether he was subject to the bank's defenses.

### Missouri's Revised UCC

Transcontinental observantly points out that *Godat* involved a transaction that occurred in 1985, and as such, was decided under the law as it then existed. As previously noted, Missouri's General Assembly revised Missouri's UCC in 1992, seven years after the Godat transaction. Among the many changes enacted, the legislators revised Section 400.3–412.[24] Transcontinental relied upon this revised section in bringing its action against First Bank. After revision, Section 400.3–412 now reads:

**400.3–412. Obligation of issuer of note or cashier's check**

The issuer of a note or cashier's check or other draft drawn on the drawer is obliged to pay the instrument (i) according to its terms at the time it was issued or, if not issued, at the time it first came into possession of a holder, or (ii) if the issuer signed an incomplete instrument, according to its terms when completed, to the extent stated in Sections 400.3–115 and 400.3–407. The obligation is owed to a person entitled to enforce the instrument or to an endorser who paid the instrument under Section 400.3–415.

Since Section 400.3–412 was revised in 1992, no Missouri case has addressed the question of whether an issuer of a cashier's check may refuse to pay its cashier's check based upon its own defenses. Transcontinental argues that, in light of this revised statutory section, *Godat* is no longer the law, and that the revised section dictates that First Bank was "obligated to pay the instrument [the 650,000 cashier's check] according to its terms at the time it was issued." Transcontinental notes that although Missouri courts have not addressed whether an issuer of a cashier's check may dishonor its check based on a claimed lack of consideration in light of revised section 3–412, other state courts have, and have "squarely rejected" the lack-of-consideration defense. Transcontinental cites two decisions, one from the Colorado Supreme Court, *Flatiron Linen, Inc. v. First Am. State Bank,* 23 P.3d 1209 (Colo.2001), and the other from the Superior Court of New Jersey, *Parks v. Commerce Bank, N.A.,* 377 N.J.Super. 378, 872 A.2d 1116 (N.J.Super.Ct.App.Div.2005). Contrary to Transcontinental's assertion, however, the Colorado Court did not base its decision on section 3–412. The New Jersey Court, on the other hand, did, holding that the issuing bank was obligated to honor its cashier's check and could not dishonor its check due to failure of consideration. *Parks,* 872 A.2d at 1118, 1122. We, of course, are not obliged to follow New Jersey law, nor do we find the court's reasoning persuasive.

Although Transcontinental asserts that *Godat* is no longer the law, the drafters of Revised Article 3, Section 412 explicitly noted that "Section 3–412 does not in substance change former law." Section 400.3–412, Comment 1. This Court, in *Godat,* similarly stated that although we were applying the law as it existed in 1985, "it does not appear that the result would be altered by application of the present Code." *Godat,* 884 S.W.2d at 3.

Section 400.3–412, by its plain language, does not speak to the issue of whether a

---

**24.** A former Section 400.3–412, which pertained to acceptances that vary from drafts, has no continuity with, and does not relate to the same topic as the revised section. It was repealed in 1992 when the revised section was enacted.

bank may raise its own defense to the. payment of a cashier's check. Section 3–412 merely defines the obligations of the "issuer of a note or cashier's check or other draft drawn on the drawer." The section simply does not address, and certainly does not preclude, defenses available to the issuer. Transcontinental argues the revised statute means that once a cashier's check is issued, it can never be dishonored. Section 3–412, however, is not limited to cashier's checks; it also covers a number of types of negotiable instruments. If Transcontinental were correct in its assertion, not only would it be impossible to stop payment on cashier's checks, but it would also be impossible to raise defenses to notes or other types of drafts. This is certainly not the law.

Noted UCC scholars also conclude that this revised statutory section says nothing about a bank's ability to assert its own defenses to payment of a cashier's check. Instead, they conclude that, under the Revised Code, a bank has the right to refuse to pay its cashier's check and defend against payment of that check based upon its own defenses. The bank's right to refuse payment, however, is subject to the rules found in Section 3–411. William Hawkland and Lary Lawrence observe:

> Section 3–412 *designates only the promise made by a maker* [of a note or issuer of a cashier's check]. *It does not deal with the defenses* or claims in recoupment a maker [of a note or issuer of a cashier's check] *may raise* in an action brought to enforce his promise . . . Sections 3–305 [Defenses and Claims in Recoupment] and 3–306 [Claims to an Instrument] should be consulted in determining the availability

of any other claim, defense or claim in recoupment in a particular situation.

. . .

> With a few exceptions, the same rules that apply to an issuer of a note also apply to the issuer of a cashier's check or other draft drawn upon the drawer. The rationales for applying these same rules is that the drawer of a draft drawn upon itself is very much like a maker . . . . Section 3–412 treats the liability of the drawer of a draft drawn upon itself the same as that of a maker of a note for the purposes of presentment and notice of dishonor. Unlike a maker's right to refuse to pay a note, *the issuer's right to refuse to pay a cashier's check is subject to the rules found in Section 3–411.*

6 Hawkland & Lawrence, *supra,* §§ 3–412:1–2 (Rev. Art. 3)(footnotes omitted)(emphases added).

Section 400.3–411, also revised in 1992, plainly contemplates an issuing bank's right to refuse to pay a cashier's check based upon its own defenses. Section 400.3–411 makes an obligated bank that refuses to pay a bank check liable for expenses, lost interest, and consequential damages in certain circumstances. The section provides in pertinent part:

> If the obligated bank [25] *wrongfully* (i) refuses to pay a cashier's check or certified check, (ii) stops payment of a teller's check, or (iii) refuses to pay a dishonored teller's check, the person asserting the right to enforce the check is entitled to compensation for expenses and loss of interest resulting from the nonpayment and may recover consequential damages if the obligated bank refuses to pay after receiving notice of

**25.** For purposes of this section, "obligated bank" means "the acceptor of a certified check or the issuer of a cashier's check or

teller's check bought from the bank." Section 400.3–411(a).

particular circumstances giving rise to the damages.

Section 400.3–411(b)(emphasis added).[26] The statute, however, provides the bank protection from expenses or consequential damages in four instances:

*Expenses or consequential damages* under subsection (b) are *not recoverable* if the refusal of the obligated bank to pay occurs because (i) the bank suspends payment, (ii) *the obligated bank asserts a claim or defense of the bank that it has reasonable grounds to believe is available against the person entitled to enforce the instrument,* (iii) the obligated bank has a reasonable doubt whether the person demanding payment is the person entitled to enforce the instrument, or (iv) payment is prohibited by law.

Section 400.3–411(c)(emphases added); *see generally,* Brian J. Davis, *The Future of Cashier's Checks under Revised Article 3 of the Uniform Commercial Code,* 27 Wake Forest L.Rev. 613, 639–40 (1992)(discussing section 3–411).

 Transcontinental contends Section 400.3–412 always requires payment of cashier's checks and prohibits a bank from refusing to pay its cashier's check based upon its own defenses. But this interpretation renders superfluous the use of the word "wrongful" in subsection (b) of Section 400.3–411. Under long-established principles of statutory interpretation, however, we presume the legislature did not insert superfluous language into a statute. Rather, we presume every word, clause, sentence and provision of a statute have effect. *Civil Serv. Com'n of City of St. Louis v. Members of Bd. Of Aldermen of City of St. Louis,* 92 S.W.3d 785, 788 (Mo. banc 2003). The legislators' inclusion of the word "wrongfully" in subsection (b) logically implies that there are occasions when a refusal to pay a cashier's check is not wrongful.

Moreover, the provision in subsection (c) that a bank will not be liable for expenses or consequential damages if it "asserts a claim or defense of the bank that it has reasonable grounds to believe is available against the person entitled to enforce the instrument" recognizes that, in appropriate circumstances, a bank may refuse to pay a cashier's check based on the bank's own defenses. If a bank could never raise its own defenses to payment of a cashier's check, as Transcontinental contends, then a bank could never have "reasonable grounds to believe" that such a defense was available.

Hawkland and Lawrence explain that Section 3–411 is designed "to resolve the conflict between the cash-like nature of bank checks and the need to prevent the use of bank checks as a means of perpetrating a fraud." 6 Hawkland & Lawrence, *supra,* § 3–411:2 (Rev. Art. 3). The drafters recognized that, when used by third parties, bank checks are accepted as cash substitutes. As a consequence, the drafters wanted to discourage the obligated bank from accommodating its customer by refusing to pay the check. On the other hand, the drafters feared that an absolute prohibition against an obligated bank's ability to raise defenses would promote fraud. The drafters, therefore, struck a balance. Under Revised Article 3, a bank has the same right as a drawer of a personal check to raise defenses or third-party claims. That right, however, comes at a cost. The obligated bank is assessed a penalty where it wrongfully and

---

**26.** A former Section 400.3–411, which pertained to the certification of a check, has no continuity with, and does not relate to the same topic as the revised section. It was repealed in 1992 when the revised section was enacted.

unreasonably refuses to pay a bank check. In such an instance, the bank is liable for expenses and consequential damages. *Id.*

Hawkland and Lawrence further explain that a bank seldom will have its own defense to payment of a cashier's check. Nevertheless, occasions may arise when a bank issues a cashier's check after being paid by personal check or other payment mechanism, only to have that personal check or other payment fail, either because of insufficient funds or a stop-payment order. Under those circumstances, they conclude, the bank may dishonor its cashier's check and advance its defense of lack of consideration against liability on that check. They explained:

> A bank seldom has a defense of its own arising out of the issuance of a [cashier's] check. Most banks require payment in full before issuing a [cashier's] check. On rare occasions, however, a bank may take a personal check or another [cashier's] check in payment for issuance of the [cashier's] check. *In the event that the personal check or other [cashier's] check is not paid, the obligated bank may have a defense to its obligation to pay its [cashier's] check. This defense is available against any person other than a holder in due course with whom it has not dealt.* The bank is not liable for either consequential damages or expenses, whether or not it is successful in raising the defense, as long as the bank reasonably believes that it has such a defense, and the presenter is subject to the defense.

6 Hawkland & Lawrence, *supra*, § 3–411:2 (footnotes omitted)(emphasis added).

The drafters of the Revised Code explicitly acknowledged that a bank may raise its personal defenses to a cashier's check. *See* Section 400.3–411, Comment 3(stating: "The bank may assert any claim or defense that it has . . . ."). Other UCC commentators also conclude that under the Revised Code, an issuing bank may refuse to pay a cashier's check and assert its own defenses. Barkley and Barbara Clark state:

> The [1992] Revision [of Article 3 of the UCC] also makes clear that the bank that issues a cashier's check or other bank obligation may always refuse payment to a non-holder in due course if it has a legitimate defense of its own, such a failure of the remitter to pay for the item. In other words, the drafters have imposed some limit on a pure 'cash equivalence' model.

1 Barkley Clark & Barbara Clark, The Law of Bank Deposits, Collections and Credit Cards, § 3.06[3] (Rev. ed.2008)(footnotes omitted). Continuing, the Clarks cogently observe:

> Although cashier's checks lose their use if they cannot be treated as cash equivalents, in the usual case it is the remitter who requests that the issuing bank refuse payment based on the remitter's defenses. The Code is clear that the bank cannot refuse payment in such a case, thereby supporting the 'cash equivalence' theory. But in cases where the bank has its own defenses to payment, the rules of negotiable instruments should come into play.

> \* \* \*

> Cashier's checks are indeed considered to be cash equivalents, even under the Revised UCC, but that characterization goes more to the fact the remitter has no right to stop payment and no right to force the issuing bank to stop payment. That is 95 percent of the cases. In the remaining 5 percent, *where the issuing bank itself never received payment for the check, it should be able to refuse payment as against a holder* (including the remitter) *who does not qualify as a*

*holder in due course.* If the drafters of the revised UCC had intended to codify a 'pure cash-equivalence' theory, under which the issuing bank has no right to stop payment under any circumstances, it would have said so clearly.

*Id.* at § 3.06[3][ii] *(footnotes omitted)(emphasis added).*

Again, First Bank did not dishonor its cashier's check in order to assert a defense belonging to the purchaser, IPD Sales & Marketing. Rather, First Bank dishonored its cashier's check and asserted its own defense. A cashier's check represents a claim on a bank's assets. Where the issuing bank has its own defenses to payment, such as when it does not receive payment for the cashier's check, the bank should be able to refuse payment and assert its defense, in order to protect itself and its assets. Based on existing Missouri law, the language of Sections 400.3–412 and 400.3–411, and the persuasive cited commentary, we hold that First Bank could refuse payment and assert its own defenses against liability on its cashier's check.

### Lack of Consideration Defense

First Bank contends it has the defense of lack of consideration against liability on its cashier's check. Missouri's UCC specifies that "[t]he drawer or maker of an instrument has a defense if the instrument is issued without consideration." Section 400.3–303(b). "Consideration" is defined as "any consideration sufficient to support a simple contract." Section 400.3–303(b). The burden of proof is on First Bank, as the party asserting the defense, to establish a lack of consideration. *See* Section 400.3–308(b), Comment 2; *Gibson v. Harl,* 857 S.W.2d 260, 267–68 (Mo.App. W.D.1993). The trial court concluded that First Bank met this burden. We agree.

As the trial court found, on the morning of May 11, 2006, Scharf went to First Bank and opened a new account in the name of IPD Sales & Marketing. Scharf funded this new account by depositing a $100 check. He then deposited a $650,000 check, which was drawn on the account of IPD Capital, a Kogan Affiliate company. When Scharf deposited this $650,000 check into the newly-opened IPD Sales & Marketing account, First Bank entered a provisional credit of $650,000 to the newly-opened account.

To pay for the cashier's check, Scharf wrote First Bank a check, drawn on the newly-opened IPD Sales & Marketing account, and against the $650,000 provisional credit made to that account. This IPD Sales & Marketing check, however, was never paid because First Bank reversed the provisional credit, leaving no available funds in the IPD Sales & Marketing account with which to pay the check Scharf wrote to First Bank to purchase the cashier's check. Because the check drawn on IPD Sales & Marketing account was never paid, First Bank was never paid for the cashier's check and thus received no consideration for the cashier's check.

Transcontinental claims First Bank manufactured the alleged lack of consideration, eight days after it issued the cashier's check, by reversing the transfer of funds as an accommodation to its customer. Transcontinental maintains the IPD Sales & Marketing check written by Scharf to purchase the cashier's check was in fact paid, as there was $650,000 in the IPD Sales & Marketing account at the time the cashier's check was issued. The company argues that under Section 400.3–412, the bank's obligation to pay a cashier's check is determined according to its terms "at the time it was issued," and that here, at the time the bank issued the cashier's check, sufficient funds were in the

IPD Sales & Marketing account to purchase the cashier's check because according to the terms of the First Bank's deposit agreement, "electronically deposited funds" are deemed to be "immediately available."

Transcontinental is correct in one respect—the newly-opened IPD Sales & Marketing account was governed by First Bank's deposit agreement. That agreement, conferring broad powers on the bank, was not challenged at trial or on appeal. We disagree, however, with Transcontinental's interpretation of that agreement. The provision regarding the availability of funds, upon which Transcontinental relies, reads in full:

> Our policy is to make funds from your cash and check deposits available to you on the first business day after the day we receive your deposit. Electronic direct deposits will be available on the day we receive the deposit. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written.

We, of course, generally construe and enforce contracts as written according to their plain meaning. *Util. Serv. & Maint., Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910, 913 (Mo. banc 2005). Nothing in the language of this provision states that funds are "immediately" available, as Transcontinental contends. Moreover, the deposit agreement provides for longer delays in the availability of funds in certain circumstances:

> Funds you deposit by check may be delayed for a longer period under the following circumstances:
> · We believe a check you deposit will not be paid.

Furthermore, the deposit agreement contains special rules regarding the availability of funds from new accounts, and provides for substantial delays in the availability of funds in certain circumstances. The agreement provides in part:

> If you are a new customer, the following special rules may apply *during the first 30 days your account is open.*
>
> *Funds from electronic direct deposits to your account will be available on the day we receive the deposit.* Funds from deposits of cash, wire transfers and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions....
>
> *Funds from all other check deposits will be available on the ninth business day after the day of your deposit.*

(Emphases added). Like the prior provision dealing with availability of funds, nothing here states that funds are "immediately" available. Transcontinental attempts to characterize the $650,000 deposit into the IPD Sales & Marketing account as an "electronic deposit," which might make the funds more quickly available. But the deposit agreement refers to "electronic direct deposits," not just any deposit that is recorded electronically. Here, the deposit was made by a check drawn on the IPD Capital account, not by an electronic direct deposit.

In addition to terms governing the availability of funds, the deposit agreement also contains provisions governing deposits. We conclude that the deposit made by Scharf into the IPD Sales & Marketing account was a provisional credit and that First Bank had the right to reverse it. The agreement states that any item accepted for deposit is subject to "later verification and final payment." Further, the deposit agreement expressly provides that First Bank is allowed to "deduct funds

from your account if an item ... is returned to us unpaid, even if you have already used the funds."

Finally, the deposit agreement also addresses conflicting demands and disputes. It provides that, if control of an account is disputed, or if the bank is unable to determine any person's authority regarding the account, the bank may, in its sole discretion, freeze that account and withhold payment from that account.[27]

Thus, as it was entitled to do by its deposit agreement, First Bank contacted Kogan, who disputed Scharf's authority to access the IPD Capital account.[28] Faced with this dispute, the bank was entitled to withhold payment from that account, resulting in the non-payment of the check drawn on that account and deposited in the IPD Sales & Marketing account. Because

that check was not paid, the bank was entitled to deduct—or reverse—the provisional credit it had made to the IPD Sales & Marketing account, even though IPD Sales & Marketing had already used those funds. Once reversed, insufficient funds remained in the IPD Sales & Marketing account with which to pay the check Scharf wrote to First Bank to purchase the cashier's check. In the end, First Bank was never paid for the cashier's check and thus received no consideration for its cashier's check.

### Holder in Due Course

 We turn now to whether, in light of this proven defense, Transcontinental may nevertheless enforce the bank's obligation to pay the instrument. Resolution

---

**27.** The deposit agreement reads in full:

**Conflicting Demands/Disputes:** If there is any uncertainty regarding the ownership of an account or its funds, there are conflicting demands over its ownership or control, or we are unable to determine any person's continuing authority to give instructions regarding the account, we may at our sole discretion: (1) freeze the account and withhold payment from all of you until we receive written proof (in form and substance satisfactory to us) of your right and authority over the account and its funds; (2) require the signatures of all of you for the withdrawal of fund; the closing of an account, or any change in the account regardless of the number of authorized signers on the account; (3) request instructions from a court of competent jurisdiction at your expense regarding the ownership or control of the account; (4) continue to honor checks and other instructions given to us by the individuals who appear as authorized signers according to our records; and (5) require a bond indemnifying the bank from any and all loss, liability, damages, costs and expenses for and on account of the payment of an adverse claim, dishonor of a check or the execution of any other order by any adverse claimant or you. In no event will we be liable for any delay or refusal to follow instructions that occurs as

a result of a dispute or uncertainty over the ownership or control of your account. We may return checks and other items, marked "Refer to Maker" (or similar language), in the event there is a dispute to uncertainty over an account's ownership or control.

**28.** We make special note of the deposit agreement's provision as to powers of attorney. Scharf, in accessing the IPD Capital account, relied on the purported powers of attorney set forth in and attached to the Escrow Agreement. While the bank initially honored the powers of attorney, it later implicitly dishonored them by stopping payment on the cashier's check. The bank could refuse the purported powers of attorney. The deposit agreement provides:

Any owner may provide us with a power-of-attorney. You should notify us in advance if you plan to create a power of attorney involving your account. Upon request, we may provide you with a power-of-attorney form for that purpose. We generally will accept a uniform Statutory Form Power of Attorney that complies with state law, or in Texas, a power of attorney executed pursuant to the Texas Probate Code. We *may refuse to accept other forms of powers of attorney, however, with or without cause.* (Emphasis added).

of this question turns on whether Transcontinental is a holder in due course of the instrument. Section 400.3–305 of Missouri's UCC, which sets forth defenses to the obligation of a party to pay a negotiable instrument, distinguishes between those defenses that may be asserted against any person entitled to enforce the instrument and those defenses that are cut off by a holder in due course.[29] The "real" defenses listed in subsection (a)(1), such as duress and lack of legal capacity, may be asserted against any person entitled to enforce the instrument. In contrast, the defenses listed in subsection (a)(2), commonly referred to as "personal" defenses, are cut off by a holder in due course. These defenses comprise those specified in Article 3 and those based on common-law contract principles. Article 3 defenses include lack of consideration for an instrument. Section 400.3–303(b). Thus, Transcontinental may cut off the bank's lack-of-consideration defense and enforce payment of the cashier's check if it can prove that it is a holder in due course.

Subject to exceptions not relevant here, Missouri's UCC defines a "holder in due course" as the holder of an instrument if:

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

---

29. In its entirety, Section 400.3–305, entitled "**Defenses and claims in recoupment**," provides:

(a) Except as stated in subsection (b), the right to enforce the obligation of a party to pay an instrument is subject to the following:
(1) a defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, (iii) fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or (iv) discharge of the obligor in insolvency proceedings;
(2) a defense of the obligor stated in another section of this Article or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract; and
(3) a claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument; but the claim of the obligor may be asserted against a transferee of the instrument only to reduce the amount owing on the instrument at the time the action is brought.
(b) The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a)(1), but is not subject to defenses of the obligor stated in subsection (a)(2) or claims in recoupment stated in subsection (a)(3) against a person other than the holder.
(c) Except as stated in subsection (d), in an action to enforce the obligation of a party to pay the instrument, the obligor may not assert against the person entitled to enforce the instrument a defense, claim in recoupment, or claim to the instrument (Section 400.3–306) of another person, but the other person's claim to the instrument may be asserted by the obligor if the other person is joined in the action and personally asserts the claim against the person entitled to enforce the instrument. An obligor is not obliged to pay the instrument if the person seeking enforcement of the instrument does not have rights of a holder in due course and the obligor proves that the instrument is a lost or stolen instrument.
(d) In an action to enforce the obligation of an accommodation party to pay. an instrument, the accommodation party may assert against the person entitled to enforce the instrument any defense or claim in recoupment under subsection (a) that the accommodated party could assert against the person entitled to enforce the instrument, except the defenses of discharge in insolvency proceedings, infancy, and lack of legal capacity.

(2) the holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 400.3–306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 400.3–305(a).

Section 400.3–302(a). The statute, with the use of the conjunctive "and," makes plain that a purported holder-in-due-course must meet the requirement of the first subsection and all six requirements of the second statutory subsection. Failure to meet any one of these requirements defeats holder-in-due-course status. Transcontinental, as the party claiming the rights of a holder in due course, has the burden of proof to establish such status. Section 400.3–308(b); *Godat*, 884 S.W.2d at 5.

The trial court held that Transcontinental failed its burden, in three respects. Specifically, the court found Transcontinental was not a holder in due course because: (1) it did not give value for the cashier's check; (2) it did not take the cashier's check in good faith; and (3) it did not take the cashier's check without notice of the facts giving rise to First Bank's defense of lack of consideration. Again, failure on any one of these defeats Transcontinental's claim. We shall limit our consideration to the issue of good faith.[30]

### Good Faith

Transcontinental argues throughout this litigation that the various Scharf–Kogan agreements were still in effect, that Scharf was acting pursuant to the powers of attorney set forth in the agreements, and that the agreements authorized his actions at the bank. Transcontinental claims Scharf was acting in good-faith reliance on those agreements. Scharf, we note, took his attorney with him to the bank, in order to explain the meaning of these many documents. The First Bank manager, when confronted with this "compendium" was understandably confounded. Transcontinental has continually sought—in the bank, in the trial court, and in this Court—to have these documents construed in the absence of Kogan, the other party to the agreements. At bottom, Scharf seeks to transmogrify this "compendium" of documents into a very large withdrawal slip directed at the bank's assets. He seeks to convert his grievance against Kogan into a claim against the bank. This he cannot do.

The trial court found the documents ambiguous and susceptible to various interpretations. The trial court also found that there was conflicting evidence whether the agreements were still in effect. The trial court did not construe the documents.

**30.** First Bank suggests we may affirm the trial court's conclusion, that Transcontinental was subject to the bank's defenses, for the separate and independent reason that Transcontinental, through its agent Scharf, had dealt directly with First Bank in connection with the purchase of the cashier's check. First Bank premises its argument on this Court's decision in *Godat*, wherein we cited the following language from Section 400.3–305: "To the extent that a holder is a holder in due course he takes the instrument free from ... (2) all defenses of any party to the instrument of any party to this instrument *with whom the holder has not dealt ...."* *Godat*, 884 S.W.2d at 4 (emphasis added). Our decision in *Godat*, as noted earlier, was based on the law as it existed in 1985. The legislature revised this statutory section in 1992 and removed this emphasized language. We need not decide, however, whether we may affirm on this separate ground because Transcontinental failed to establish its status as a holder in due course.

We, also decline the invitation. Interpretation of the "compendium" of documents is not necessary for our decision. Again, we are adjudging the rights between the bank and Scharf, not the rights between Scharf and Kogan. Even if Scharf had the right to access funds in the IPD Capital account, this does not alter the bank's rights pursuant to its deposit agreement to conclude that the funds were disputed. The bank's rights and actions—in dealing with Scharf and initially allowing his access to Kogan's account, and then reversing that decision and stopping payment on the cashier's check—are governed by the UCC and the deposit agreement, not the "compendium" of documents. And we need not interpret the documents to conclude that Transcontinental was not acting in good faith.

▮ Missouri's UCC defines "good faith" as "honesty in fact in the conduct or transaction concerned." Section 400.1–201(19). "Good faith" is largely a subjective test. *Godat,* 884 S.W.2d at 6.

The trial court could easily conclude that Scharf and Transcontinental were not "honest in fact" in their business conduct at the bank. Scharf knew Kogan would vociferously protest any attempt to transfer funds out of the Kogan account into the new account controlled by Scharf. Indeed, Scharf conceded he knew Kogan's nature, and that "it wouldn't surprise me if he did in fact contest" the withdrawal of funds from Kogan's account. He further stated that Kogan "generally disputes anything

that takes a dollar out of his pocket." Yet Scharf went to the bank, with his attorney, precisely to withdraw funds from the Kogan account, rather than seek any remedy in court. It may be that some of Scharf's actions were lawful and honest. Perhaps he owed no duty to the bank to tell it of Kogan's anticipated protest. Maybe he could proffer the "compendium" of documents to see what use the bank would make of them. But Scharf went much further than this. He affirmatively misled the bank. Scharf represented that he was an owner and member of IPD Sales & Marketing. Scharf and his attorney represented that money was needed for a "small closing." Coleman, Scharf's attorney, told Riganti that they were at a closing when Riganti telephoned them. He also told Riganti that the power of attorney was signed. These were dishonest statements.

Scharf was not an owner and member of IPD Sales & Marketing. The cashier's check was not sought for a "small closing." Scharf and Coleman were not at a closing when Riganti telephoned. The power of attorney attached to the Escrow Agreement was not signed. This is not honesty in fact. Scharf made these misrepresentations to gain access to the funds in the Kogan account and to lull the bank into a false state of ease with the transactions. The trial court rightly concluded that Transcontinental could not be a holder in due course because of its lack of good faith.[31]

---

**31.** In a related point, Transcontinental challenges the trial court's exclusion of information regarding the arbitration award issued on August 10, 2007, which arbitrated the disputes between Scharf and Kogan. Transcontinental contends the evidence should have been admitted because the findings of the arbitrator are material to the issue of Transcontinental's holder-in-due-course status. Specifically, Transcontinental contends the

arbitration award, finding that the Escrow Agreement was still in effect on May 11, 2006, and that Transcontinental's use of the power of attorney granted in the Escrow Agreement was authorized by the agreements and law, is evidence of Transcontinental's good faith in collecting the funds.

The trial court has broad discretion to admit or exclude evidence at trial. *In re Care and Treatment of Donaldson,* 214 S.W.3d 331, 334

To summarize, Transcontinental failed to establish its status as a holder in due course. Consequently, Transcontinental's right to enforce First Bank's obligation to pay its cashier's check is subject not only to the bank's "real" defenses but also its "personal" defenses, including the asserted defense of lack of consideration. First Bank established that it received no consideration for its cashier's check and therefore is not liable to Transcontinental for the amount of that instrument.

### Consequential Damages

 Lastly, Transcontinental challenges the trial court's conclusion that the company was not entitled to consequential damages and expenses under Section 400.3–411. Missouri's UCC provides that consequential damages or expenses "are not recoverable if the refusal of the obligated bank to pay occurs because ... (ii) the obligated bank asserts a ... defense of the bank that it has reasonable grounds to believe is available against the person entitled to enforce the instrument...." Section 400.3–411(c). The trial court rightly concluded that First Bank had reasonable grounds to believe it had a valid defense to payment of the cashier's check. Indeed, the bank not only had reasonable grounds to believe they had a defense; it actually had the defense. The bank did not receive consideration for its cashier's check. Thus, Transcontinental is not entitled un-

der Section 400.3–411 to consequential damages and expenses.

We affirm the judgment of the trial court.

ROY L. RICHTER, P.J., and GEORGE W. DRAPER III, J., concur.

---

(Mo. banc 2007). We give great deference to the trial court's evidentiary rulings and will reverse the trial court's decision only if the court clearly abused its discretion. *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 872 (Mo.App. E.D.2009). A trial court abuses its discretion when its ruling is "clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Donaldson*, 214 S.W.3d at

334. The trial court excluded information regarding the arbitration award, reasoning that the matter at hand involved events that occurred between Scharf and the bank on May 11, 2006; that the award had been issued over a year after this date, on August 10, 2007; and that as of the date of trial, the arbitration award had yet to be confirmed by the court, and even then could be subject to appeal and reversal, and thus was not final. We find *no abuse of discretion.*